STATE OF NEW JERSEY, DEPART-
MENT OF ENVIRONMENTAL
PROTECTION, Plaintiff,

v.

GLOUCESTER ENVIRONMENTAL
MANAGEMENT SERVICES,
INC., et al., Defendants.

AIR PRODUCTS AND CHEMICALS,
INC., et al., Third–Party
Plaintiffs,

v.

ANCORA PSYCHIATRIC HOSPITAL;
Glassboro State College; New Jersey
State Hospital (Trenton State Hospital);
and Trenton State Teachers' College
(Trenton State College), et al., Addition-
al Third–Party Defendants.

Civil No. 84–152(JBS).

United States District Court,
D. New Jersey.

March 22, 1995.

Deborah T. Poritz, Attorney General of New Jersey by Edward Devine, Deputy Attorney General, Trenton, NJ, for Plaintiff State of New Jersey, Department of Environmental Protection.

John F. Lynch, Jr., Jennifer L. Kapell, Carpenter, Bennett & Morrissey, Newark, NJ, for Alleged Generator Defense Group.

Deborah T. Poritz, Attorney General of New Jersey by Patrice M. Connell, Deputy Attorney General, Trenton, NJ, for Third–Party Defendants Ancora Psychiatric Hospi-

tal, Glassboro State College (Rowan College), New Jersey State Hospital (Trenton State Hospital), and Trenton State Teachers' College (Trenton State College).

Alex Beehler, Trial Attorney, Environmental Enforcement Section, Environment and Natural Resources Division, U.S. Department of Justice, Washington, D.C., for Plaintiff United States GEMS II.

Jeffrey P. Heppard, Parker, McCay & Criscuolo, Marlton, New Jersey, For Operators Group.

William Greenberg, McCarter & English, Newark, New Jersey, for Township of Gloucester.

James C. Orr, Wilson, Elser, Moskowitz, Edelman & Dicker, Newark, New Jersey, for Transporters Group.

John S. Fitzpatrick, Fitzpatrick, Reilly, Supple & Gaul, New Providence, New Jersey, for Municipalities Group.

John B. Kearney, Kenney & Kearney, Cherry Hill, New Jersey, Operators—AS & G.

SIMANDLE, District Judge:

## I. *Introduction and Procedural History*

The present motion raises interesting questions of Eleventh Amendment immunity and its waiver. The plaintiff State of New Jersey, Department of Environmental Protection and Energy [NJDEPE] seeks in this multi-party hazardous waste case to recover monetary and injunctive relief against several hundred parties pursuant to various federal and state environmental protection laws, arising at the GEMS Landfill in Gloucester Township, Camden County, New Jersey. Originally filed in the Superior Court of New Jersey and asserting only claims arising at state law, this action was removed to this court in 1984. The court denied a private party's motion to remand or dismiss, finding that removal was proper and that federal question jurisdiction existed. *State of N.J.*

*Dept. of Environmental Protection v. GEMS,* 719 F.Supp. 325, 333–341 (D.N.J.1989).[1]

On February 1, 1990, NJDEPE filed a Seventh Amended Complaint pursuant to which it asserted claims under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. §§ 9601–9675 ("CERCLA"), against all the direct defendants it had previously brought into the litigation under the previous six amended complaints. On March 16, 1990, NJDEPE filed its Eighth Amended Complaint naming a large number of additional parties as direct defendants, including many parties who had allegedly used the waste hauling and processing services of the Almo Anti–Pollution and Tank Cleaning Corporations ("Almo"). The NJDEPE alleged that these many parties had hired Almo to transport and dispose of various substances, and that these were disposed of at the GEMS Landfill.

A group of alleged Generator Defendants obtained leave of court to file a Second Amended Third–Party complaint, naming additional third-party defendants based on the alleged Almo connection. Among the parties joined as third-party defendants were the movants on the present motion, which are two hospitals and two colleges of the State of New Jersey. The Second Amended Third–Party Complaint, analogous to the State's Eighth Amended Complaint, asserts claims based on State statutory and common laws, including the Spill Compensation and Control Act,. N.J.S.A. 58:10–23.11, *et seq.* ("Spill Act"). The NJDEPE asserts no CERCLA claims against these Almo-connection parties.

In the present motion, the third-party defendants Ancora Psychiatric Hospital, Trenton State Hospital (Trenton Psychiatric Hospital), Glassboro State College (subsequently renamed "Rowan College") and Trenton State College seek summary judgment dismissing the claims against them based upon immunity from suit under the Eleventh Amendment of the United States Constitution. They argue that they are agencies of

1. Other aspects of this case have been addressed in several opinions: *State of N.J. Dept. of Environmental Protection v. GEMS,* 138 F.R.D. 421 (D.N.J.1991) (liaison counsel fees, case management); 821 F.Supp. 999 (D.N.J.1993) (municipal liability under CERCLA and New Jersey Spill Act); and 866 F.Supp. 826 (D.N.J.1994) (claims procedures under New Jersey Sanitary Landfill Facility Closure and Contingent Fund Act).

654

the State of New Jersey, protected by the Eleventh Amendment from monetary relief on a claim arising only at State law. These state entities pleaded the Eleventh Amendment as an affirmative defense and seek summary judgment dismissing the pleadings against them.

In opposition, the Generator Defendants contend that these state entities are not the equivalent of the State of New Jersey for purposes of Eleventh Amendment immunity, and that even if such immunity would otherwise preclude suit against these state entities in federal court, the State of New Jersey has through its conduct and claims as plaintiff in this multi-million-dollar, multi-party litigation waived its Eleventh Amendment immunity.

This court holds, for reasons stated below, that where the State of New Jersey has acted in its sovereign capacity to invoke the jurisdiction of the federal court to assert claims arising at state law against a waste hauler and many of its customers, it has waived its Eleventh Amendment immunity with respect to claims brought by others, as third-party plaintiffs, seeking contribution for the same liability against state agencies that were also allegedly customers contributing to the same waste stream through the same waste hauler.

## II. Discussion of Law

### A. Whether these Entities are the Alter Ego of the State for Eleventh Amendment Purposes

The four state entities that have been named as third-party defendants based on their alleged "Almo connection" have jointly moved for summary judgment claiming that the Eleventh Amendment bars the Generators' third-party action against them. The Generators argue that because the State, through the NJDEPE, is the plaintiff in this action, no State entity can assert the Eleventh Amendment as a jurisdictional defense. The State contends that notwithstanding the NJDEPE's actions as the plaintiff in this litigation, the State, via the NJDEPE, has not waived the Eleventh Amendment immu-

nity available to these four purportedly separate and distinct state agencies who are not voluntary participants in this lawsuit.

■ For these two State colleges and psychiatric institutions to assert Eleventh Amendment immunity in the face of the NJDEPE's actions, they must initially establish that they are entitled to invoke the protection of the Eleventh Amendment in the first place. *See Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 400–01, 99 S.Ct. 1171, 1176–77, 59 L.Ed.2d 401 (1979). As the parties claiming the entitlement of Eleventh Amendment protection, the two colleges and the two psychiatric institutions bear the burden of making this requisite showing. *See ITSI TV Productions, Inc. v. Agricultural Assoc.,* 3 F.3d 1289, 1291 (9th Cir.1993); *Crawford v. Richard Stockton State College,* Civil Action No. 90–1230 (D.N.J. Sept. 26, 1990) (Gerry C.J.).

■ The Eleventh Amendment provides:

The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any foreign State.

U.S. Constitution, XI Amendment. Notwithstanding its express, limited terms, the Supreme Court has interpreted the Eleventh Amendment as encompassing suits brought against a State by its own citizens as well. *See Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890). *See also Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 906–07, 79 L.Ed.2d 67 (1984) (citing *Hans* ). Further, although the language of the Amendment refers only to the State itself, the Supreme Court has held that it also bars actions against a State in federal court for money damages when "the state is the real, substantial party in interest." *Pennhurst,* 465 U.S. at 101, 104 S.Ct. at 908 (1984).[2] Stated differently, a state agency is entitled to the same Eleventh Amendment immunity en-

---

**2.** It is clear, as the *Pennhurst* Court has stated, that "suit in which the State or one of its agencies or Departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst,* 465 U.S. at 100, 104 S.Ct. at 908.

joyed by the State itself when a judgment against the agency "would have had essentially the same practical consequences as a judgment against the State itself." *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979). In *Urbano v. Board of Managers*, 415 F.2d 247, 251–52 (3d Cir.1969), *cert. denied*, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 128 (1970), the Third Circuit laid down a nine-factor test to be used to determine whether a state agency is entitled to invoke Eleventh Amendment immunity. Noting that several of the *Urbano* factors were interrelated, the Third Circuit, for purposes of clarity and simplicity, later divided them into three broader categories. *See Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655 (3d Cir.) (en banc), *cert. denied*, 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989). Under *Fitchik*'s three-part analysis, the court is to determine:

> (1) Whether the money that would pay the judgment would come from the state (this includes three of the *Urbano* factors—whether payment will come from the state's treasury, whether the agency has the money to satisfy the judgment, and whether the sovereign has immunized itself from responsibility for the agency's debts);
>
> (2) The status of the agency under state law (this includes four factors—how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation); and
>
> (3) What degree of autonomy the agency has.

*Fitchik*, 873 F.2d at 659.[3]

### 1. The State Colleges

■ Applying the three *Fitchik* factors to the state colleges now moving for summary judgment, one finds that the issue whether they are alter egos of the State for purposes of Eleventh Amendment immunity is a very close question.

### a. Funding of the State Colleges

None of the three *Fitchik* factors is itself dispositive. *Id.*, 873 F.2d at 659. The Third Circuit has stated, however, that the question of whether any judgment would be paid out of the state treasury is the "most important" factor. *Id. See also Urbano*, 415 F.2d at 251 (referring to it as "the most significant factor"). The importance ascribed to this factor is premised upon the Amendment's central goal—"the prevention of federal court judgments that must be paid out of the state's treasury." *Fitchik*, 873 F.2d at 659–60 (citation omitted).

Citing its earlier opinion in *Blake v. Kline*, 612 F.2d 718 (3d Cir.1979), *cert. denied*, 447 U.S. 921, 100 S.Ct. 3011, 65 L.Ed.2d 1112, the Third Circuit in *Kovats v. Rutgers, The State University*, 822 F.2d 1303 (3d Cir. 1987), *cert. denied*, 489 U.S. 1014, 109 S.Ct. 1126, 103 L.Ed.2d 188 (1989), explained that "relief should not be viewed as coming from the state where an entity has the ability to pay a judgment from private funds not subject to state control." *Kovats*, 822 F.2d at 1308. Rutgers, the Court noted, received substantial amounts of money from sources other than the State itself. *Id.* at 1309.

Moreover, as the Court further explained, the Eleventh Amendment inquiry does not turn upon whether the state contributes a majority of an agency's funds, either directly or indirectly. *Id.* at 1309. What mattered instead was "whether [the agency's] segregated general fund would be sufficient to pay the judgment and whether the state treasurer's control over [the agency's] funds was discretionary or simply ministerial." *Id.* at 1308–09. In finding that the funding factor tipped in favor of a finding of no Eleventh Amendment immunity, the Court observed that Rutgers retained considerable discretion in the use of its non-state funds. It also noted that Rutgers had "substantial non-state funds" in both commingled and segre-

---

**3.** The *Fitchik* Court recognized that one of the *Urbano* factors—whether the agency exercises a governmental or proprietary function—is no longer a valid criterion in light of the Supreme Court's opinion in *Garcia v. San Antonio Metro. Transit Authority*, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). *See Fitchik*, 873 F.2d at 659 n. 2.

gated accounts out of which a judgment could be paid. *Id.* at 1309. The Court was not persuaded by Rutgers' argument that even a payment from non-state sources would result in an indirect payment from the state treasury to the extent that the state budget compensated for any resulting shortfall to Rutgers. The Court observed that any increase in Rutgers' state appropriation as a result of an adverse judgment against the university would be entirely the result of "discretionary action by the state." *Id.*[4]

The Third Circuit also found in favor of the plaintiff, and against a finding of Eleventh Amendment immunity for New Jersey Transit ("NJT"), in *Fitchik.* The Court stated that:

> The most striking financial detail is that NJT's money does *not* come predominately from the state. New Jersey provides less than 33% of NJT's operating funds.... But even putting that significant fact aside, we note that the fact that an entity derives some of its income from the state does not mean that it is entitled to partake of the state's immunity. "The nature of the state's obligation to contribute may be more important than the size of the contribution." ... What is significant is whether the money that pays the fine will come from the state treasury rather than the agency's funds, or (alternatively) whether the state must reimburse the agency and thus effectively pay the debt.

*Id.*, 873 F.2d at 660 (emphasis in original) (citations omitted).

The Court observed that although NJT (and Rutgers) were created by statute to serve a public purpose and both receive significant funding from the state, the state had not "obligated itself to pay the entit[ies'] debts." *Fitchik* at 662. "Thus judgments against both Rutgers and NJT would be paid out of their own funds, rather than the public fisc." *Id.* In addition, the court noted that

"both Rutgers and NJT can turn to sources besides state appropriations to meet shortfalls, and NJT also has insurance to help offset its losses." *Id.* The Court concluded that "[j]ust as it did in *Kovats,* the funding factor here weighs strongly against NJT's claim that it is entitled to immunity from suit in federal court." *Id.*

Two district courts have relied upon these Third Circuit decisions in finding that the funding factor militated against a finding that New Jersey State Colleges are entitled to Eleventh Amendment immunity. In *Crawford, supra,* Chief Judge John F. Gerry noted that while over half of Richard Stockton State College's budget was paid by the state, the College, like Rutgers, received funding from several sources, including state appropriations as well as tuition, fees, and alumni and other contributions. *Id.,* Letter Opinion at 7. He also stated that "it is not enough for Stockton to show that the state will ultimately bear a heavier burden of support for the college because of an adverse judgment. Stockton must show that it is unable to pay the judgment out of its privately gathered funds because it lacks that measure of control over its finances[.]" *Id.,* Letter Opinion at 7.

Chief Judge Gerry rejected Stockton's conclusory assertion that any judgment against it would be paid from the state treasury. Judge Gerry stated that the record was unclear as to how Stockton's operating budget was structured and whether the state funds were kept in separate accounts or commingled in the same accounts with privately supplied funds. *Id.,* Letter Opinion at 8. Chief Judge Gerry noted, though, that in either event the Stockton Board of Trustees had the power to "[d]isburse all moneys appropriated to the college by the Legislature and all moneys received by tuition, fees, auxiliary services and other sources[.]" *Id.* (quoting N.J.S.A. 18A:64–6(e)).[5]

---

**4.** In contrast, the Third Circuit held in *Port Authority Police Benevolent Association, Inc. v. Port Authority of New York and New Jersey,* 819 F.2d 413 (3d Cir.1987), that the authority was entitled to immunity at least in part because the governing statute provided that "[u]nless ... the revenues from operations conducted by the port authority are adequate to meet all expenditures, the

legislatures of the two states *shall appropriate* [the amounts needed]." *Id.* at 416 (emphasis added).

**5.** Chief Judge Gerry also cited N.J.S.A. 18A:64–7, which provides that:

> The board of trustees of a state college, in addition to the other powers and duties provid-

Further, Judge Gerry found it significant that the state colleges, like NJT, have the power to purchase liability insurance and to do so out of non-state funds if they so choose. *Crawford*, Letter Opinion at 9. *See also* N.J.S.A. 18A:64-6(k). Given this opportunity, Judge Gerry refused to allow Stockton to "bootstrap itself into an alter ego of the state simply by failing to take any steps to enable it to pay a judgment out of non-public funds." *Id.*

Chief Judge Gerry did point out that one factor extant in both *Kovats* and *Fitchik* which militated against Eleventh Amendment immunity did not apply to the state colleges. Unlike in *Kovats* (NJT) and *Fitchik* (Rutgers), the state has obligated itself to pay the state colleges' debts. *Crawford*, Letter Opinion at 9. This fact did not tip the scales in favor of immunity however, since the state colleges can turn to non-state sources of income to meet a shortfall caused by an adverse judgment. *Id.* (citing *Fitchik*, 873 F.2d at 662 (citing *Kovats* )). Quoting *Blake v. Kline, supra,* Chief Judge Gerry noted that " 'the existence of even significant state financial support will not necessarily encase an entity with eleventh amendment immunity. Rather, a court should consider whether the state, in making the contribution, is acting in the role of the sovereign or is contributing in some other capacity.' " *Crawford*, Letter Opinion at 9 (quoting *Blake*, 612 F.2d at 724).

In light of these considerations, and because Stockton failed to demonstrate conclusively that " 'it would need to request funds from the state coffers in order to meet short-falls caused by adverse judgments,' " *Crawford* at 9 (quoting *Fitchik*, 873 F.2d at 661), Chief Judge Gerry concluded that the funding factor weighed slightly in favor of the plaintiffs and against a finding of immunity. *Crawford* at 9-10. *See also Rehberg v. Glassboro State College*, 745 F.Supp. 1113, 1115-16 (E.D.Pa.1990) (finding, in a case in-volving one of the two moving third-party defendants in the case at bar, "no practical distinction" between Rutgers and the state colleges on the issue of funding).

Even beyond these considerations, Glassboro State College has had the good fortune of receiving a gift of $100 million from private benefactors in 1992, resulting in the renaming of the institution as Rowan College, in recognition of the gift by Henry M. and Betty Rowan. (*New York Times*, July 7, 1992, at A–1.) This suggests a strong, continuous endowment created from a source other than the public treasury.

This court, for the reasons expressed by the courts in *Crawford* and *Rehberg*, likewise finds that the funding factor supports the conclusion that the state college third-party defendants are not entitled to invoke the protection afforded to the states by the Eleventh Amendment. Neither Trenton State College nor Glassboro State College has presented this court with sufficient evidence to justify a different conclusion.

b. *Status of the College Under State Law*

The second *Fitchik* factor asks "whether state law treats an agency as independent or as a surrogate for the state." *Fitchik*, 873 F.2d at 662.

The New Jersey State Legislature has spoken to this question. The pertinent legislation provides that state colleges shall have a high degree of independence:

The Legislature hereby finds that it is in the best interest of the State that the State colleges shall be and continue to be given a high degree of self-government and that the government and conduct of the colleges shall be free of partisanship. The Legislature finds further that a decentralization of authority and decision-making to the boards of trustees and administrators of the State Colleges in the area of personnel, budget execution, purchasing and con-

ed herein and within the general policies and guidelines set by the board of higher education, shall have and exercise the powers, rights and privileges that are incident to the proper government, conduct and management of the college, and the control of its properties and funds and such powers granted to the

college or the board or ¸reasonably implied, may be exercised without recourse or reference to any department or agency of the state, except as otherwise provided by this article or applicable law.
*Crawford*, Letter Opinion at 8 n. 3.

tracting will enhance the idea of self government. . . .

N.J.S.A. 18A:64–1.

In addition, the state colleges have been granted the authority to control their finances, maintain their own accounts and make their own spending decisions. N.J.S.A. 18A:64–6(f). The state colleges may also enter into contracts for the purchase of land, equipment and personal property from third parties and, within general guidelines, make their own hiring decisions and curriculum decisions. N.J.S.A. 18A:64–6.

State law permits the state colleges to use and adopt a corporate seal. N.J.S.A. 18A:64–6(a). While it is true, as the defendants here point out, that the right to use and adopt a corporate seal is not tantamount to having a separate corporate existence, it is also true that the state has not created the state colleges, unlike Rutgers, see *Kovats*, 822 F.2d at 1310, as a "corporation which 'is the instrumentality of the state for the purpose of operating the state university.' N.J.S.A. 18A:65–2." [6]

The state colleges' capacity to sue or be sued and their immunities from state taxation are also relevant considerations in the context of the present inquiry. See *Fitchik*, 873 F.2d at 662. The state colleges are immune from all state taxation. *Rehberg*, 745 F.Supp. at 1116. And while Rutgers remains able to sue and be sued in its own right, see *Kovats*, 822 F.2d at 1310, as does the NJT, see *Fitchik*, 873 F.2d at 663, the state colleges do not possess the statutory authority to sue or be sued. See *Crawford*, Letter Opinion at 10; *Rehberg*, 745 F.Supp. at 1116. The New Jersey State College Governing Boards Association ("GBA"), in which all state colleges are members, N.J.S.A. 18A:64–45, does have the power to sue and be sued, N.J.S.A. 18A:64–48(d). The GBA's right to sue and be sued must be viewed in conjunction with the organization's statutory purpose, however. That stated purpose is to:

> encourage and aid all movements for the improvement of State college education and . . . make recommendations to the

Board of Higher Education regarding the coordination of the State colleges on matters of mutual interest and concern.

N.J.S.A. 18A:64–50. It is unclear whether the GBA would have standing to sue on behalf of a state college, especially in an area falling outside the above-stated narrow statutory purpose.

The state colleges' contention that they are merely surrogates for the state is further supported by the fact that they are subject to the New Jersey Administrative Procedures Act, the New Jersey Tort Claims Act, the New Jersey Contract Liability Act, and the State College Contracts Law. See *Crawford*, Letter Opinion at 10. These Acts restrict somewhat the independent powers exercised by the colleges, *i.e.*, the authority to enter into contracts. In addition, the state colleges have the power of eminent domain, a hallmark of state sovereignty. *Id.*; N.J.S.A. 18A:64–6(*l*). These considerations would seem to cut in favor of a finding of immunity. The Third Circuit, however, has cautioned against "taking these arguments too far[.]" *Fitchik*, 873 F.2d at 663. For example, the New Jersey Tort Claims Act also applies to New Jersey municipalities and counties, as well as Rutgers, none of which are accorded sovereign immunity. See *id.* The Third Circuit further explained that "the fact that NJT has the power of eminent domain, and thus exercises a 'slice of state power' does not mean that it is necessarily entitled to Eleventh Amendment immunity." *Id.* (citing *Lake Country Estates*, 440 U.S. at 401, 99 S.Ct. at 1177).

These foregoing considerations do not give rise to a clear answer as to the colleges' status under state law. Some support a finding of immunity, others do not. The Third Circuit has observed "some reluctance on the part of the New Jersey courts to accord immunity to agencies whose status under New Jersey statutes is ambiguous." *Fitchik*, 873 F.2d at 663. In light of the ambiguity as to the colleges' status, and the seeming presumption against immunity where an entity's status is unclear, we do not go so far as the *Rehberg* court's conclusion that "[o]n balance, Glassboro's status under

---

**6.** NJT also enjoys a separate corporate existence.

*See Fitchik,* 873 F.2d at 663.

state law weighs significantly in favor of granting Fifth Amendment immunity." *Id.,* 745 F.Supp. at 1116. We do concur, though, with the *Crawford* court's conclusion that this second *Fitchik* factor, *i.e.,* the entity's status under state law, "tilts slightly" in favor of finding immunity of the state colleges, "but only to a small degree." *Crawford,* Letter Opinion at 11.

### c. *Autonomy*

The *Crawford* court and the *Rehberg* court sharply diverged on the question of the autonomy enjoyed by New Jersey state colleges. In *Rehberg,* the Eastern District of Pennsylvania concluded that "Glassboro's relative autonomy weighs substantially in favor of considering Glassboro an arm of the state for purposes of Eleventh Amendment immunity." *Id.,* 745 F.Supp. at 1116. In contrast, Chief Judge Gerry of this court concluded that the autonomy factor "strongly favors a finding that Stockton [State College] is not an alter ego of New Jersey." While we do not agree that this factor weighs strongly against a finding of immunity, we do conclude that this factor weighs slightly against affording the state colleges Eleventh Amendment immunity protection.

As has already been suggested by the discussion in section B, *supra,* the state colleges possess a high degree of autonomy. *See also Crawford,* Letter Opinion at 11; N.J.S.A. 18A:64–1, 2, 6, 7. Each state college is governed by its own Board of Trustees. N.J.S.A. 18A:64–2. Each Board, whose numerous powers are set forth at N.J.S.A. 18A:64–6, is composed of nine citizens of the state, as well as the Chancellor of the Board of Education, who sits as an *ex officio* nonvoting member, N.J.S.A. 18A:64–3. The individual Boards are of course obliged to com-

ply with state laws and regulations, including the guidelines promulgated by the Board of Higher Education. But this obligation does not, in our opinion, overly infringe upon the individual schools' autonomy.

The Board of Higher Education, whose powers and duties are set forth at N.J.S.A. 18A:3–14, is charged with the task of "advanc[ing] long range planning for the system of higher education ...; establish[ing] general policy for the governance of the separate institutions ...; and maintain[ing] general financial oversight of the state system of higher education." N.J.S.A. 18A:3–13. The governing legislation expressly provides that the Board of Higher Education "shall not administer the individual institutions of higher education, its own administration being specifically reserved unto each of such institutions." *Id.*

The *Rehberg* court noted the Governor's veto power over appointments to the individual Board of Trustees, and the fact that individual members are limited to two six-year terms. *See id.,* 745 F.Supp. at 1116.[7] Further, one cannot disregard the state colleges' obligation to comply with state regulations regarding such things as student admissions and degree requirements.[8] *See id.*

On balance, the state colleges possess significantly less autonomy than Rutgers, for example, and this factor of overall autonomy points neither toward comprehensive state control nor general state permissiveness toward the colleges' operations.

Having reviewed the three *Fitchik* factors with respect to the New Jersey state colleges, we conclude that, on balance, the scale tips slightly away from the colleges' contention that they are alter egos of the state.

---

7. In contrast, the Governor *appoints* six of the eleven voting members of Rutgers' Board of Governors. *See Kovats,* 822 F.2d at 1311 (citing N.J.S.A. 18A:65–14). The Governor also appoints eleven members (the six persons appointed by the Governor to the Board of Governors and five others) of Rutgers' other governing body, the Board of Trustees. *Id.* (citing N.J.S.A. 18A:65–15(I)(b)). As for NJT, three out of seven of its board members must be members of the executive branch of the state, and the Governor has veto power over the board's actions. *See Fitchik,* 873 F.2d at 663.

8. The *Rehberg* court was also influenced by the fact that unlike Rutgers, the state colleges are subject to the provisions of the Administrative Procedure Act, Civil Service Rules and Regulations, and competitive bidding statutes. *Id.,* 745 F.Supp. at 1116. *Kovats* suggests that this fact should cut against a finding of autonomy. *Id.,* 822 F.2d at 1312. In *Fitchik,* however, which was handed down two years after *Kovats,* the Third Circuit, sitting en banc, cautioned against "taking these arguments too far[.]" *Fitchik,* 873 F.2d at 663.

We have found that the most important factor, that of funding, militates against the immunity, and that the factor of the colleges' status under New Jersey law weighs slightly in favor of immunity. We also have concluded that the third and final factor, which looks to the degree of the colleges' autonomy, is essentially in equipoise for purposes of finding that the colleges are alter egos of the state. Because this question is so close, and in recognition that the courts of New Jersey itself have shown reluctance to accord immunity to agencies whose status under New Jersey statutes is ambiguous, *Fitchik*, 873 F.2d at 663, this court finds that Trenton State College and Glassboro State College (Rowan College) are not alter egos of the State under the Eleventh Amendment.

### 2. The Psychiatric Hospitals

For the two psychiatric hospital third-party defendants (Ancora and Trenton), the picture is clearer for Eleventh Amendment analysis. These hospitals were created by statute, N.J.S.A. 30:1–7, and are operated by the Department of Human Services, which is "a principal department in the Executive Branch of the State Government," N.J.S.A. 30:1–2, under the control of the Commissioner of Human Services, N.J.S.A. 30:1–12, who serves at the pleasure of the Governor. N.J.S.A. 30:1–8 & 30:1–11.

These entities have established that their funding comes almost entirely from appropriations by the Legislature out of the general State treasury. (Certif. of Joseph Guider ¶¶ 4–6.) Less than 1% of the respective budgets of Ancora and Trenton come from sources other than state funds, such as those few patients who are able to reimburse the state for their mental health care. (*Id.* ¶ 5.) Any judgment against these hospitals in this case would be paid from the State treasury. (*Id.* ¶ 7.) Neither institution is statutorily authorized to sue or be sued in its own right.

These circumstances militate in favor of a finding, under the *Fitchik* factors, that the

Trenton State Hospital and Ancora Psychiatric Hospital are alter egos of the State of New Jersey for Eleventh Amendment purposes. Unless New Jersey, by its conduct of the litigation upon these claims, has waived its Eleventh Amendment immunity, the state psychiatric entities are immune from suit in the federal court. Therefore the issue of waiver is next discussed.

### B. *Exception to Eleventh Amendment Immunity Arising from Waiver by State*

The Supreme Court has recognized certain exceptions to the reach of the Eleventh Amendment. The Court, for example, has held that the Eleventh Amendment is "necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976). *See also Welch v. Texas Department of Highways and Public Transportation*, 483 U.S. 468, 474, 107 S.Ct. 2941, 2946, 97 L.Ed.2d 389 (1987). In addition, a state may also expressly waive its own Eleventh Amendment immunity by statute and consent to suit in federal court. *See Welch*, 483 U.S. at 473, 107 S.Ct. at 2945–46. In general, a state will be deemed to have so waived its immunity to suit in federal court "only where stated by the most express language or by such overwhelming implications from the text as [will] leave no other room for any other reasonable construction." *Id.* (citations and internal quotation marks omitted).[9]

The Generators do not contend that the state has expressly waived its Eleventh Amendment immunity. Rather, they argue that it has implicitly done so through its conduct as the plaintiff in this litigation. The Generators assert that "[w]hen a state proceeds deliberately in federal court, either as a plaintiff or a claimant, Eleventh Amendment immunity is inapplicable." Alleged Generators' Supp.Br. at 28, *citing Gunter v. Atlantic Coast Line RR Co.*, 200 U.S. 273,

---

9. The Court has further stated that a "State's constitutional interest in immunity encompasses not merely *whether* it may be sued, but *where* it may be sued." *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 99, 104 S.Ct. 900, 907, 79 L.Ed.2d 67 (1984) (emphasis in original). A State thus will not be understood to have waived its Eleventh Amendment immunity to suit in federal court merely because it waived its sovereign immunity in its own courts. *Id.* at 99 n. 9, 104 S.Ct. at 907 n. 9.

284 & 292, 26 S.Ct. 252, 256, 259, 50 L.Ed. 477 (1906). The Supreme Court noted in *Gunter*, "None of the prohibitions ... of the [Eleventh] Amendment ... relate to the power of a federal court to administer relief in causes where jurisdiction has been acquired as a result of voluntary action of the State in submitting its rights to judicial determination." 200 U.S. at 284 & 292, 26 S.Ct. at 256, 259.

Even before *Gunter*, a state's waiver of Eleventh Amendment immunity by voluntary appearance was well-established. In *Clark v. Barnard*, 108 U.S. 436, 2 S.Ct. 878, 27 L.Ed. 780 (1883), the plaintiff filed suit naming the General Treasurer of the State of Rhode Island as a defendant. The Treasurer moved to dismiss, arguing that the suit was in effect one against the State and was thus barred by the Eleventh Amendment. The Supreme Court denied the Treasurer's motion, finding that the State had waived its immunity when it "made itself a party" to the litigation by voluntarily appearing and prosecuting a claim in the nature of an interpleader against the fund in controversy. *Id.*, 108 U.S. at 448, 2 S.Ct. at 883–84. The Court stated that:

> The circumstance that the appearance of the State was entered without prejudice to the demurrer of Clark, the General Treasurer, does not affect the result. For that demurrer could not reach beyond the question of the right to sue Clark by reason of his official character, which became insignificant when the State made itself a party.

*Id.* See also *Gunter v. Atlantic Coast Line RR Co.*, 200 U.S. at 284, 292, 26 S.Ct. at 256, 259 (citing *Clark*). *Clark* has continuing vitality today, *see e.g., Vecchione v. Wohlgemuth*, 558 F.2d 150, 158 (3d Cir.1977), *cert. denied*, 434 U.S. 943, 98 S.Ct. 439, 54 L.Ed.2d 304 (1977) (finding waiver by litigating state's rights); *Skehan v. Board of Trustees of Bloomsburg State College*, 669 F.2d 142, 149 (3d Cir.1982), *cert. denied*, 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982) (noting that Eleventh Amendment immunity can be "waived by a general or voluntary appearance in federal court by an officer of

the state, such as the attorney general," citing *Clark*).

A state's consent to suit in federal court notwithstanding Eleventh Amendment immunity may be found by implication, such as where the state acts under a Congressionally-created interstate compact, *Petty v. Tennessee–Missouri Bridge Comm.*, 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959); *Hess v. Port Authority Trans–Hudson Corp.*, 809 F.Supp. 1172 (D.N.J.1992); *Walsh v. Port Authority Trans–Hudson Corp.*, 813 F.Supp. 1095 (D.N.J.1993) (conditional statutory waiver). A state's participation in a federal program, however, will not necessarily be found to imply a consent to be sued for actions arising under that program, *see Edelman v. Jordan*, 415 U.S. 651, 673, 94 S.Ct. 1347, 1360–61, 39 L.Ed.2d 662 (1974); *Florida Dept. of Health & Rehabilitative Servs. v. Florida Nursing Home Assn.*, 450 U.S. 147, 150, 101 S.Ct. 1032, 1034, 67 L.Ed.2d 132 (1981) (per curiam). Thus, while a state's voluntary participation in a federal program will not generally operate to waive Eleventh Amendment immunity, a state's voluntary invocation of the federal court's power to adjudicate its rights may give rise to a waiver of Eleventh Amendment immunity, under the *Clark/Welch/Gunter* doctrine.

Applying these precepts to the four entities,[10] this court has not found any precedent which is directly on point. We find, however, that the circumstances of this case and the procedural history of this litigation compel the conclusion that the State has waived its Eleventh Amendment immunity with respect to state agencies that have allegedly contributed to the waste stream of the Almo entities, and that the moving state third-party defendants accordingly cannot assert such immunity as a bar to the Generators' claims against them for contribution upon these claims originally launched by the State as plaintiff.

After removal of this case to this federal court, the State, through a series of amended pleadings, has greatly enlarged the number of potentially responsible parties named as defendants in this case. The vast majority of the defendants are the alleged Generators.

---

**10.** The two state college entities are not alter egos of the state, as discussed above. If for the sake of argument one assumed that Eleventh Amendment immunity would shield the colleges, this consideration of the waiver issue applies to them as it does to the psychiatric hospitals.

In its last pleading, the Eighth Amended Complaint, the State, acting through the NJDEP (which has since been renamed the "New Jersey Department of Environmental Protection and Energy" ("NJDEPE")), brought in a number of additional defendants based upon the alleged Almo connection. This is the same connection, as noted above, upon which the Generators have asserted their third-party claims against the moving state colleges and psychiatric hospitals, and the claims against these state entities are thus quite narrow.

The State has asserted both federal and state law claims. In its Seventh Amended Complaint, filed on February 1, 1990, the State asserted claims under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601–9675. CERCLA claims may only be heard in federal court. 42 U.S.C. § 9613(b). The State also has asserted claims under the New Jersey Spill Compensation and Control Act (the "Spill Act"), N.J.S.A. 58:10–23.11, *et seq.*

The alleged Generators have not filed CERCLA claims against the third-party defendants. Rather, their third-party claims against the moving State entities track those filed by the State in its Eighth Amended Complaint vis-a-vis the alleged Almo connection, and they assert claims for contribution under, *inter alia*, the Spill Act and New Jersey common law. *See* Second Amended Third–Party Complaint, filed on or about October 24, 1990.

We agree with the State that it never explicitly conceded waiver of its Eleventh Amendment immunity by statute and that an excerpt from one of its prior briefs explicitly attempted to preserve Eleventh Amendment immunity. In the NJDEPE's Brief dated May 16, 1986, submitted in connection with an earlier jurisdictional motion before the Honorable Stanley S. Brotman, the State argued:

> In addition, as recently as November 2, 1984, NJDEPE expressly reasserted its immunity under the Eleventh Amendment and other principles of sovereign immunity on the record in this very case. At that time, NJDEPE had argued in favor of this Court's retaining jurisdiction over this case (following its removal from the state court by the [EPA] and EPA's subsequent dismissal from the action) for reasons of judicial economy and to avoid a multiplicity of lawsuits. However, in arguing orally before this Court in favor of this result on November 2, 1984, counsel for NJDEPE was careful to state that in no way should its position be interpreted as a waiver by the State of New Jersey of its Eleventh Amendment and other sovereign immunity as to claims which may be asserted against it in this litigation.

NJDEPE Brief, dated May 16, 1986, at 12. We disagree with the State, however, that the four moving State entities can be treated as "involuntary" parties who can claim immunity notwithstanding the State's active and otherwise voluntary role in this litigation.

By its terms, the Eleventh Amendment affords immunity to "one of the United States." The Generators argue that although the NJDEPE is the designated plaintiff, the State of New Jersey is the real party in this case. They assert that the pleadings themselves lead unavoidably to that conclusion since, for example, they seek relief in the name of the State. *See, e.g.,* the Seventh Amended Complaint. In other words, the NJDEPE is itself an alter ego of the State. We agree.

The claims asserted by the NJDEPE and the rights sought to be vindicated thereby belong to the State. For example, the Spill Act speaks in terms of discharges onto the State's lands and the State's waters. *See, e.g.,* N.J.S.A. 58:10–23.11a. The State is the real party in interest in this litigation. The fact that the NJDEPE is the named plaintiff, rather than the "State of New Jersey," is a distinction without any legal or logical consequence to the Eleventh Amendment waiver analysis. The NJDEPE, which operates in the executive branch of the State (N.J.S.A. 13:1D–1) and whose Commissioner is appointed by and serves at the pleasure of the Governor (N.J.S.A. 13:1B–2), is charged with formulating and promoting the State's policy on environmental issues, and with enforcing those policies, to protect

the state's environment. N.J.S.A. 13:1D–9.[11] The State acts through its various agencies and departments, and it is easily understood why the NJDEPE rather than any other State agency is the named plaintiff. We thus do not find it relevant or important that "the State third-party defendants belong to State agencies separate from the NJDEPE." State's Reply Brief, dated April 13, 1992. Because the NJDEPE has acted in this litigation as the State, this court must determine whether "the State," as one of "the United States," can be deemed to have waived its immunity under the facts of record. Thus, where state agencies have claimed and received the alter ego status of the State itself, the correct inquiry is not whether one State agency or entity can waive the immunity of other State agencies or entities, but instead whether the State's submission of its rights to the federal court's determination gives rise to waiver of the immunity of the State for claims directly arising from the State's own causes of action.

[13] Similarly, when the State has removed an action from state to federal court and thereafter files a third-party complaint, it has been held to waive Eleventh Amendment immunity. *M.A.I.N. v. Commissioner, Maine Dep't of Human Servs.,* 697 F.Supp. 557 (D.Me.1988), *vacated on other grounds,* 876 F.2d 1051 (1st Cir.1989). Further, a state plaintiff in a federal suit will be held to have made a "voluntary submission" to federal jurisdiction under the *Clark* test, *supra,* and thus to have waived its Eleventh Amendment immunity with respect to a counterclaim arising from the same subject matter and seeking recoupment against the state's claim, but not for a counterclaim seeking injunctive relief, *Woelffer v. Happy States of America, Inc.,* 626 F.Supp. 499, 502 (N.D.Ill. 1985). A state plaintiff thus will be subject to suit by way of counterclaim arising from the same transaction, the consent to such countersuit being implied. *See Fletcher v. U.S. Department of Energy,* 763 F.Supp. 498, 502 (D.Kan.1991) (but holding that state at-

torney general's intervention does not create a waiver as to all issues).

The State of New Jersey's participation in this case, through the NJDEPE, is much more extensive than was that of Rhode Island in *Clark,* where the State merely filed a claim for interpleader in an existing suit. Here, the State itself voluntarily enlarged the litigation by filing the Eighth Amended Complaint asserting only state law claims more than five years after the case was removed to federal court. It is true that it originally filed the suit in its own courts, but it did voluntarily enlarge the suit here in federal court once the EPA was dismissed, including the very claims at issue in this motion. Furthermore, as previously noted, the State has since asserted claims under CERCLA which can only be brought in federal court. We need not decide whether a state waives Eleventh Amendment immunity when it files a CERCLA action in federal court, since federal court jurisdiction is exclusive under CERCLA, and the notion that a state thereby acts voluntarily to submit its rights to federal court adjudication is fairly debatable. Such concerns are not presented here, however, where the sole basis of joinder of the state entities arises from the State's voluntary decision to launch an Eighth Amendment Complaint aimed at Almo-connection Generator defendants, asserting only claims arising at State law, and only after the case was in this Court.

The State's extensive participation also included the entry of the administrative consent order in 1989 confirming the negotiated settlement of the state's claims against over a hundred parties in exchange for a remediation of the GEMS Landfill in an extensive project funded by the alleged responsible parties for $32.5 million. This order also created the GEMS Site Trust to oversee compliance with the remediation plan in what is called the Phase I Settlement. Intensive negotiations to conclude an agreement on all remaining issues (the Phase II Settlement Process) are underway with court supervision and mediation under General Rule 49 of

11. Moreover, another decision has recognized that the NJDEP is entitled to Eleventh Amendment immunity as an arm of the State, *see, e.g., Woodland Private Study Group v. State of N.J.,*

*Dept. of Env. Protection,* 616 F.Supp. 794, 799–800 (D.N.J.1985), *vacated on other grounds,* 846 F.2d 921 (3d Cir.1988).

this court. Even if the State had not filed the Eighth Amended Complaint adding the Almo-connection parties, it would be difficult to square the State's intense federal court involvement with the notion that the State remains immune from claims against its agencies by third-party complaints.[12]

The case at bar is distinguishable from the more oft-encountered case in which a defendant files a counterclaim against the State-plaintiff. The courts have consistently held that a State-plaintiff does not automatically waive its sovereign immunity with respect to all plausible counterclaims. *See Woelffer v. Happy States of America, Inc.,* 626 F.Supp. at 502. In order to be cognizable and to fall outside of the Eleventh Amendment bar, the counterclaim must "1) arise from the same event underlying the state's action and 2) be asserted defensively, by way of recoupment, for the purpose of defeating or diminishing the State's recovery, but not for the purpose of obtaining an affirmative judgment against the State." *Id.* (Internal quotation marks and citations omitted). *See also CPC International, Inc. v. Aerojet–General Corp.,* 764 F.Supp. 479, 482 (W.D.Mich.1991) (citations omitted).

Here, the defendant Generators have filed not a counterclaim against the NJDEPE, but rather a third-party claim against two state colleges and two state psychiatric hospitals, who are assumed in this motion to be the equivalents of the State itself. This is a distinction in terminology and procedure, but not in substance. The NJDEPE filed suit against the Generators to recover for environmental damage they caused or contributed to at the GEMS landfill, including through the Almo connection. The Generators, in turn, filed a third-party claim against the State colleges and hospitals seeking contribution for their connections to Almo. It is quite true, as the State emphasizes, that the colleges and hospitals did not become named "parties" to this suit until they were impleaded by the Generators. But although the Generators' claims were not filed as counter-

claims against the NJDEPE, the agency empowered by the State to file suit, they were nevertheless filed, in effect, against the State—the entity protected by the Eleventh Amendment—to seek a sharing of the Almo-related generators' liability.

As discussed above, this court has found that the two hospital movants have established that they are each the equivalent of the State for Eleventh Amendment purposes, and it has assumed for the sake of this discussion that the state colleges are too, notwithstanding the court's finding to the contrary, above. If the moving third-party defendant colleges and hospitals are entitled to claim Eleventh Amendment immunity in the first place, it is only because they are for all intents and purposes "the State." The State colleges and hospitals cannot in one breath claim to be the alter egos of the State and as such entitled to share in all of the State's immunities, and in the next breath argue, in effect, that they are not the same State which filed the suit in the first place, albeit through a different State agency. The Generators' third-party claims are in actuality more tantamount to a counterclaim against a plaintiff than to a "true" third-party claim which serves to bring in a completely new and separate party to the litigation.

We further find that the Generators' third-party claims against the State colleges and hospitals satisfy the previously mentioned conditions set forth in *Woelffer* and *CPC International, supra.* First, the Generators' claims against the State "arise from the same event underlying the State's action." *CPC Intern.,* 764 F.Supp. at 482; *Woelffer,* 626 F.Supp. at 502. Second, the Generators are not seeking an affirmative judgment against the State, but rather are seeking the equivalent of a "recoupment for the purpose of defeating or diminishing the State's recovery[.]" *CPC Intern.* at 482; *Woelffer* at 502. In other words, the Generator defendants on the State's Almo-connection claim have not

---

12. Although this court's holding does not turn upon NJDEP's consummation of the Phase I settlement and participation in the Phase II process, at least one other court has found that a state's participation in federal court settlement negotiations, agreement and court approval indicated the state's consent to federal jurisdiction on all settlement related matters. *In re Washington Public Power Supply System Securities Litigation,* 720 F.Supp. 1379, 1413–14 (D.Ariz.1989).

enlarged the relief sought against the allegedly responsible state entities beyond the narrow confines of the State's Almo-related claim itself.

For these reasons, this court holds that the State has waived the sovereign immunity of the four state entities named as third-party defendants upon the Almo-related claims, to the limited extent of subjecting the state entities to a judgment that diminishes the state's recovery upon its Almo-related causes of action.

### III. *Conclusion*

For reasons discussed above, the motion of third-party defendants Ancora Psychiatric Hospital, Glassboro State College (Rowan College), New Jersey State Hospital (Trenton State Hospital), and Trenton State Teachers' College (Trenton State College) for summary judgment on grounds of Eleventh Amendment immunity will be denied. The accompanying Order is entered.

#### ORDER DENYING STATE ENTITIES' TYPE V SUMMARY JUDGMENT MOTION

This matter having come before the court upon motion of the Additional Third–Party Defendants Ancora Psychiatric Hospital, Glassboro State College (Rowan College), New Jersey State Hospital (Trenton State Hospital) and Trenton State Teachers' College (Trenton State College) [hereinafter "State Entities"] for summary judgment dismissing all claims against them based on the Eleventh Amendment of the United States Constitution; and

Having considered the briefs and supplemental briefs of the respective counsel, and having heard oral argument; and

Having concluded, for reasons stated in the Opinion of today's date that the motion shall be denied;

IT IS this 22nd day of March, 1995 hereby

ORDERED that the motion by these State Entities for summary judgment be, and it hereby is, DENIED.