**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3812
_____

PAULA MALIANDI

v.

MONTCLAIR STATE UNIVERSITY,
Appellant
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-14-cv-01398)
District Judge: Honorable Stanley R. Chesler
_____

Argued: April 4, 2016

Before: AMBRO, KRAUSE, *Circuit Judges*, and
THOMPSON,* *District Judge*

(Opinion filed: December 27, 2016)

_____

* The Honorable Anne E. Thompson, District Judge
for the United States District Court for the District of New
Jersey, sitting by designation.

_____

Jennifer J. McGruther, Esq. **(Argued)**
Office of Attorney General of New Jersey
Department of Law & Public Safety
Division of Law
Richard J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, NJ 08625

*Counsel for Appellant*

Michael R. DiChiara, Esq. **(Argued)**
Krakower DiChiara
77 Market Street
Suite 2
Park Ridge, NJ 07656

*Counsel for Appellee*

_____

OPINION OF THE COURT
_____

KRAUSE, *Circuit Judge*.

Our federalist system of government accords respect for the sovereignty of the States in a variety of ways, including the Eleventh Amendment to the United States Constitution, which immunizes States from suits brought in federal court by both their own citizens and citizens of other States. The Eleventh Amendment's protection, however, is not limited to the States alone, but rather extends to entities

that function as "arms of the State." In this case, we are asked to resolve a split among the district courts in our Circuit as to whether Montclair State University ("MSU") is an arm of the State of New Jersey, which would render it immune from the discrimination suit brought by Appellee Paula Maliandi. Applying the balancing test we have developed to make such determinations, we conclude that, while a close case, MSU is an arm of the State, thus affording it access to the refuge of the Eleventh Amendment. Accordingly, we will reverse the decision of the District Court and remand for proceedings consistent with this opinion.

## I.    Background

According to her complaint, Paula Maliandi began working for MSU in November 2007 and took medical leave for breast cancer treatment in early 2013. Despite having complied with all pertinent policies and procedures for taking such leave, Maliandi allegedly was denied her original position when she returned and instead was offered an inferior position, which she declined. She was subsequently terminated. Maliandi then filed suit against MSU for wrongful termination, seeking money damages and equitable relief under both federal and state law. Maliandi's federal claim arises under the Family Medical Leave Act ("FMLA") for termination on account of a "serious [health] condition." While she does not cite a specific provision in her complaint, it would appear her claim is rooted in the so-called "self-care provision," 29 U.S.C. § 2612(a)(1)(D), and its corresponding retaliation provision, 29 U.S.C. § 2614(a). Together, these provisions entitle a qualifying employee to twelve weeks of leave for a "serious health condition" and require an employer to restore an employee who took leave under § 2612 to her prior position or an equivalent one upon her return.

3

Maliandi's state law claim arises under the New Jersey Law Against Discrimination ("NJLAD"), N.J. Stat. Ann. §§ 10:5-1 to -49, which, among other things, prohibits discrimination on account of a disability or handicap.

MSU moved to dismiss Maliandi's complaint under Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction based on its contention that, as an arm of the State, it is owed Eleventh Amendment immunity from suit in federal court.[1] The District Court denied the motion, determining that MSU is not the State's alter ego and, in turn, concluding that MSU is subject to suit in federal court for both the federal and state law claims.[2] MSU appeals.

---

[1] In both the District Court and on appeal, MSU has been represented by the Attorney General of the State of New Jersey.

[2] Because neither party raises an argument on appeal as to whether Congress has, pursuant to its authority under Section Five of the Fourteenth Amendment, abrogated Eleventh Amendment immunity for claims brought under the FMLA, we do not address that question today. Assuming Maliandi is seeking to state a claim under § 2612(a)(1)(D) of the FMLA, however, such an argument would be unavailing. *Coleman v. Court of Appeals of Md.*, 132 S. Ct. 1327, 1334-38 (2012) (plurality opinion) (concluding § 2612(a)(1)(D) does not abrogate Eleventh Amendment immunity); *id.* at 1338-39 (Scalia, J., concurring in judgment) (same); *see also Hale v. Mann*, 219 F.3d 61, 69 (2d Cir. 2000) (concluding that "29 U.S.C. § 2612(a)(1)(D), and the related retaliation section, *see id.* § 2614(a)(1)" do not abrogate Eleventh Amendment immunity).

4

The District Court had jurisdiction under 28 U.S.C. § 1331 to adjudicate Maliandi's FMLA claim and under 28 U.S.C. § 1367 to consider her associated state law claim. The District Court's order denying MSU's 12(b)(1) motion to dismiss on Eleventh Amendment immunity grounds is immediately appealable under the collateral order doctrine, imbuing us with jurisdiction under 28 U.S.C. § 1291. *Cooper v. Se. Pa. Transp. Auth.*, 548 F.3d 296, 298 (3d Cir. 2008) (citing *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144-45 (1993)). We consider whether MSU is owed Eleventh Amendment immunity *de novo*; as "the party asserting immunity," MSU "bears the burden of production

Similarly, because the issues were not raised before us, we do not address whether New Jersey has waived its Eleventh Amendment immunity from suit in federal court with regard to Maliandi's NJLAD claim or the consequences for the District Court's exercise of supplemental jurisdiction on remand. *See Wis. Dep't of Corr. v. Schacht*, 524 U.S. 381, 391-93 (1998) (implying that a federal court can retain jurisdiction over state law claims after federal claims are dismissed on Eleventh Amendment grounds); *Rudolph v. Adamar of N.J., Inc.*, 153 F. Supp. 2d 528, 540-44 (D.N.J. 2001) (discussing differing applicability of the Eleventh Amendment to NJLAD claims brought in federal court against New Jersey in its capacity as an employer compared to those brought against the State in its legislative or executive capacity); *see also Heine v. Comm'r of Dep't of Cmty. Affairs*, C.A. No. 2:11-5347, 2014 WL 4199203, at *5 (D.N.J. Aug. 22, 2014) (not published) (discussing district court decisions regarding New Jersey's immunity from suit in federal court for NJLAD claims).

and persuasion." *Febres v. Camden Bd. of Educ.*, 445 F.3d 227, 228-29 (3d Cir. 2006).

## II.    Discussion

Our Eleventh Amendment jurisprudence has wound its way through a number of variations—both subtle and significant—over the past decades.  To distill the principles that govern our analysis today, we first review the constitutional underpinnings and precedent relevant to the arm of the State inquiry, and we then apply those principles to determine whether MSU qualifies as an arm of the State entitled to immunity.

### A.  History and Precedent

The Eleventh Amendment began as a simple rebuke of the Supreme Court's decision in *Chisolm v. Georgia*, 2 U.S. 419 (1793), that would have subjected States to suits in federal court and saddled them with the weight of the burgeoning republic's Revolutionary War debts.  *Hans v. Louisiana*, 134 U.S. 1, 10-11 (1890); *see also Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 39 (1994).  More than two centuries later, however, it has evolved into a potent tool for States to ensure that States retain their sovereignty and integrity as constituent polities of our national government.  *Hess*, 513 U.S. at 39-40.  Thus, the Supreme Court has recognized that the Amendment does not merely shield state treasuries.  Instead, it advances two fundamental goals: safeguarding States' dignity and protecting their financial solvency. *Id.* at 52.  And although, by its terms, the Eleventh Amendment only withholds from the federal judiciary the power to decide cases brought against a State by a citizen of another State or a foreign government, U.S.

Const. amend. XI, the Court has interpreted it to bar suits against a State by its own citizens—not just those from other jurisdictions. *Hans*, 134 U.S. at 10-15; *see also Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996).

Importantly for this case, the Court also has read the Amendment to bar not only suits against States themselves, but also suits for damages against "arms of the State"— entities that, by their very nature, are so intertwined with the State that any suit against them renders the State the "real, substantial party in interest." *Edelman v. Jordan*, 415 U.S. 651, 663 (1974) (quoting *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)); *see also Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (using the term "arm of the State"); *Febres*, 445 F.3d at 229.

Because the Eleventh Amendment provides the States with sweeping immunity from suit, we have been careful to ensure that its reach does not extend beyond proper bounds. Accordingly, we employ a fact-intensive, three-step balancing test to ascertain whether a state-affiliated entity is an "arm of the State" that falls within the ambit of the Eleventh Amendment. Our initial recitation of the test came in *Urbano v. Board of Managers*, 415 F.2d 247, 250-51 (3d Cir. 1969), *cert. denied*, 397 U.S. 948 (1970), where we identified nine factors to consider. Two decades later in *Fitchik v. New Jersey Transit Rail Operations, Inc.*, 873 F.2d 655, 659 (3d Cir. 1989) (en banc), we attempted to consolidate those *Urbano* factors into a more manageable three-factor test that still governs today.

As explained in more detail below, the *Fitchik* factors are (1) the funding factor: whether the state treasury is legally

7

responsible for an adverse judgment entered against the alleged arm of the State; (2) the status under state law factor: whether the entity is treated as an arm of the State under state case law and statutes; and (3) the autonomy factor: whether, based largely on the structure of its internal governance, the entity retains significant autonomy from state control. *Id.* Because, for the most part, we did not disagree with the *Urbano* factors,[3] but rather organized them under the headings of *Fitchik*'s three factors, the layers of factors, subfactors, and considerations that inform those subfactors can still make an analysis seem dense, if not impenetrable. Moreover, each step of that analysis is a "fact-intensive" undertaking that requires a fresh analysis and "individualized

---

[3] Although *Urbano* identified as a factor whether an entity performed a governmental or proprietary function, this factor was jettisoned in *Fitchik* in light of intervening Supreme Court precedent. *Fitchik*, 873 F.2d at 659 n.2 (citing *Garcia v. San Antonio Metro. Transit Auth.*, 469 U.S. 528, 546-47 (1985)). While the Supreme Court has since made reference to a "function" inquiry for Eleventh Amendment purposes, *see Hess*, 513 U.S. at 44-45 (comparing the function of the entity at issue with that of an entity from a pre-*Garcia* case and concluding the function was not "readily classified as typically state or unquestionably local"), and other Circuits still employ one in the Eleventh Amendment context, *e.g.*, *Ernst v. Rising*, 427 F.3d 351, 359 (6th Cir. 2005); *Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 65 & n.7 (1st Cir. 2003), we are bound by our Court's Eleventh Amendment test that now eschews this inquiry, *Fitchik*, 873 F.2d at 659 n.2.

determinations" for each entity claiming Eleventh Amendment immunity. *See Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 546 (3d Cir. 2007).

After identifying the direction in which each factor points, we balance them to determine whether an entity amounts to an arm of the State. *Fitchik*, 873 F.2d at 664; *see also Cooper*, 548 F.3d at 311. While our jurisprudence had long afforded the first factor—state funding—more weight than the others, *see Fitchik*, 655 F.2d at 664, we recalibrated the factors in light of the Supreme Court's observation in *Regents of the University of California v. Doe*, 519 U.S. 425, 431 (1997), that an Eleventh Amendment inquiry should not be a "formalistic question of ultimate financial liability." We now treat all three *Fitchik* factors as co-equals, *Benn v. First Judicial Dist. of Pa.*, 426 F.3d 233, 239-40 (3d Cir. 2005), with the funding factor breaking the tie in a close case, *see Febres*, 445 F.3d at 229-30 (citing *Hess*, 513 U.S. at 47-48, 52).

We have had many occasions to apply the *Fitchik* (and, earlier, *Urbano*) factors, ruling on the Eleventh Amendment status of entities ranging from school boards to public transit authorities to state-affiliated institutions of higher learning. Of particular relevance to this case are our decisions concerning the Pennsylvania State College System, Rutgers University, and the University of Iowa. In 1976, we ruled *en banc* that Pennsylvania's Bloomsburg State College was an arm of the State, *Skehan v. Bd. of Trs. of Bloomsburg State Coll.*, 538 F.2d 53, 62 (3d Cir.) (en banc) (*Skehan I*), *cert. denied*, 429 U.S. 979 (1976), though our opinion there never mentioned, much less applied, *Urbano*. We later concluded, under the *Urbano* rubric, that the Eleventh Amendment also shields Pennsylvania's State System of

9

Higher Education. *Skehan v. State Sys. of Higher Educ.*, 815 F.2d 244, 249 (3d Cir. 1987) (*Skehan II*). That same year, we concluded in *Kovats v. Rutgers, The State University*, 822 F.2d 1303 (3d Cir. 1987), that Rutgers—a New Jersey public university that was initially chartered as a private institution—was not an arm of the State under our *Urbano* framework. Then in 2007, we considered the status of the University of Iowa in *Bowers* and determined that, under *Fitchik*, it was an arm of the State on account of two of the three factors supporting immunity. *See Bowers*, 475 F.3d at 549.

These cases provide guidance as we consider MSU and are "helpful in terms of analytic models," but they ultimately do not "govern our decision as to [MSU] because 'each state university exists in a unique governmental context, and each must be considered on the basis of its own peculiar circumstances'"—including the specific statutes at play and the practical reality of the institution's autonomy. *Kovats*, 822 F.2d at 1312 (quoting *Soni v. Bd. of Trs. of the Univ. of Tenn.*, 513 F.2d 347, 352 (6th Cir. 1975)).[4]

---

[4] Indeed, all three of our past cases addressing institutions of higher learning are distinguishable in their own right. *Skehan I*, which predates our modern *Fitchik* test, was based on the laws of Pennsylvania rather than New Jersey, and relied almost exclusively on a state court case that characterized the college as an arm of the State, *Skehan I*, 538 F.2d at 62 (calling state court jurisprudence "dispositive of the sovereign immunity issue")—a myopic analysis that is out of step with our multi-factor test and that we have since held *en banc* should not be read to obviate the need to undertake a full *Fitchik* analysis, *Bolden v. Se. Pa. Transp. Auth.*, 953

10

The case law from our Sister Circuits is also illuminating. As MSU points out, they have almost uniformly concluded that state-affiliated universities are arms of their respective States. *See, e.g.*, *Kreipke v. Wayne State Univ.*, 807 F.3d 768 (6th Cir. 2015), *cert. docketed*, No. 15-1419 (May 23, 2016); *Irizarry-Mora v. Univ. of P.R.*, 647 F.3d 9 (1st Cir. 2011); *Md. Stadium Auth. v. Ellerbe Becket Inc.*, 407 F.3d 255, 262 (4th Cir. 2005) (collecting cases for proposition that state universities are "[a]lmost universally" found to be arms of the State); *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 575 (10th Cir. 1996) (collecting cases for the proposition that the Tenth Circuit has "consistently found state universities are arms of the state"); *Kashani v. Purdue Univ.*, 813 F.2d 843, 845 (7th Cir.), *cert. denied*, 484 U.S. 846 (1987) ("The vast majority of cases considering the issue have found state universities to be forfended by the Eleventh Amendment."); *id.* ("[While] [t]here are district court

F.2d 807, 815 n.8 (3d Cir. 1991) (en banc) (stating that it would be an "error" to read *Skehan I* to mean that "state law characterization is the only relevant consideration in determining if an agency is entitled to raise the Eleventh Amendment defense"). While *Kovats* dealt with a New Jersey institution, Rutgers is distinguishable from MSU both because of its unique origins as a private institution and the fact that it is governed by a different set of state laws. *See* 822 F.2d at 1310-12; *compare* N.J. Stat. Ann. §§ 18A:64-1 to -93 (laws governing state colleges like MSU), *with id.* §§ 18A:65-1 to -102 (Rutgers provisions). And *Bowers* similarly dealt with a different State's university system, which established the University of Iowa in the state constitution—a trait not shared with New Jersey state colleges like MSU. 475 F.3d at 548.

11

opinions to the contrary[,] . . . it would be an usual state university that would not receive immunity."); *Hall v. Med. Coll. of Ohio at Toledo*, 742 F.2d 299, 301-02 (6th Cir. 1984), *cert. denied*, 469 U.S. 1113 (1985) (collecting cases for the proposition that "[t]he great majority of cases addressing the question of Eleventh Amendment immunity for public colleges and universities have found such institutions to be arms of their respective state governments and thus immune from suit").

As we proceed with our own analysis, we are mindful of the near unanimity among the Courts of Appeals that the factors relevant to an Eleventh Amendment inquiry typically favor immunity in the state college setting. However, because the particulars of our *Fitchik* test differ from analogous tests in other Circuits and because each entity seeking immunity warrants an individualized analysis, these cases do not dictate the answer to the question of first impression with which we are presented today.

That question has bedeviled district judges in our Circuit, who are divided in their application of the *Fitchik* test to MSU. *Compare Maliandi v. Montclair State Univ.*, C.A. No. 14-01398 (SRC), 2014 WL 3778259 (D.N.J. July 31, 2014) (not published) (concluding MSU is not an arm of the State), *and Ventura v. Montclair State Univ.*, C.A. No. 08-5792 (SRC), 2011 WL 550720 (D.N.J. Feb. 9, 2011) (not published) (same), *with Sarmiento v. Montclair State Univ.*, C.A. No. 04-cv-4176, letter op. (D.N.J. Mar. 31, 2005) (concluding MSU is an arm of the State).[5] We now resolve

_____

[5] It is not just MSU sowing dissention among the district courts. Courts applying our *Urbano* and *Fitchik* rubrics to other New Jersey state colleges also have reached

12

this dispute by concluding that MSU is an arm of the State, and in the process, we seek to synthesize our jurisprudence regarding the *Fitchik* factors for the benefit of district courts in future Eleventh Amendment cases.

### B. *Fitchik* **Analysis for MSU**

After undertaking our own analysis of MSU's Eleventh Amendment immunity, we cannot agree with the District Court's determination that all three *Fitchik* factors counsel against immunity. For the reasons set forth below, we conclude that the funding factor counsels against immunity, but that the status under state law and autonomy factors—while close—tilt in favor of extending MSU immunity from suit. On balance, because two of the three co-

inconsistent conclusions, in part because of the evolving nature of our case law and in part because the issue presents "a very close question," *N.J. Dep't of Envtl. Prot. v. Glouchester Envtl. Mgmt. Servs., Inc.*, 923 F. Supp. 651, 655 (D.N.J. 1995). *Compare Bostanci v. N.J. City Univ.*, C.A. No. 08-4339 (SRC), 2010 WL 4961621 (D.N.J. Dec. 1, 2010) (not published) (denying immunity to New Jersey City University), *and N.J. Dep't of Envtl. Prot.*, 923 F. Supp. at 665 (same to Glassboro State College and Trenton State College), *with Nannay v. Rowan Coll.*, 101 F. Supp. 2d 272 (D.N.J. 2000) (granting immunity to Rowan College), *and Rehberg v. Glassboro State Coll.*, 745 F. Supp. 1113 (E.D. Pa. 1990) (same to Glassboro State College). We note that Glassboro State College was later named Rowan College, and then renamed Rowan University. Thus, a number of these cases rehashed the Eleventh Amendment immunity question for the same institution.

equal factors support MSU's claim for immunity, we hold that MSU is an arm of the State that enjoys the protections afforded by the Eleventh Amendment.

### 1. The Funding Factor

The funding factor, also called the "state-treasury criterion," *Febres*, 445 F.3d at 232 & n.4, hinges on "[w]hether the money that would pay [a] judgment [against the entity] would come from the state," *Fitchik*, 873 F.2d at 659. We consider three subfactors: (1) a State's legal obligation to pay a money judgment entered against the alleged arm of the State; (2) alternative sources of funding (*i.e.*, monies not appropriated by the State) from which the entity could pay such judgments; and (3) specific statutory provisions that immunize the State from liability for money judgments. *Id.*; *see also Cooper*, 548 F.3d at 302-06.

### i. The State's Legal Obligation to Pay Money Judgments

The Supreme Court has made clear in the years since *Fitchik* that we must focus our Eleventh Amendment inquiry not on a mechanical analysis of whether a State will ultimately pay a judgment, but rather "the crux of the state-treasury criterion [is] whether the state treasury is legally responsible for the payment of a judgment against the [alleged arm of the State]." *Febres*, 445 F.3d at 233; *id.* at 236 ("The absence of any legal obligation on the part of New Jersey to provide funds in response to an adverse judgment . . . is a compelling indicator that the state-treasury criterion . . . weighs against immunity."); *accord Bowers*, 475 F.3d at 546-47 (citing *Doe*, 519 U.S. at 431). Specifically, the Supreme Court has characterized the operative question as

14

"whether a money judgment against a state instrumentality or official would be enforceable against the State," *Doe*, 519 U.S. at 430, meaning that if a State only voluntarily indemnifies an entity, the funding factor is unlikely to tip in favor of immunity, despite the practical reality that the State foots the bill for a money judgment, *Bowers*, 475 F.3d at 547.[6]

Rather than identify a legally enforceable obligation on the part of the State to pay money judgments entered against it, MSU relies largely on the argument that such money judgments would indirectly affect the state treasury because "the University financial statements are included in the State's annual financial accounting." Appellant's Br. 27-28. MSU's primary argument thus appears to be that this reporting requirement would cause New Jersey to increase appropriations to cover losses that result from money judgments entered against the university. *Maliandi*, 2014 WL 3778259, at *2.

We have consistently rejected the argument that a State's voluntary choice to pay a state-affiliated entity's liabilities—even if that choice might be a foregone conclusion because of the State's desire to keep the entity afloat—favors Eleventh Amendment immunity. *E.g.*, *Bowers*, 475 F.3d at 547; *Febres*, 445 F.3d at 236; *Bolden v. Se. Pa. Transp. Auth.*, 953 F.2d 807, 819 (3d Cir. 1991) (en

---

[6] Conversely, the fact that a State is legally obligated to pay may be enough to satisfy this factor even if another entity—*e.g.*, the federal government—will later indemnify the State, causing the outlay by the State to have no actual impact on the state treasury. *Doe*, 519 U.S. at 431.

banc); *Fitchik*, 873 F.2d at 661; *Kovats*, 822 F.2d at 1309. Instead, in conformance with *Doe*, we have made clear that "practical or indirect financial effects of a judgment may enter a court's calculus, but rarely have significant bearing on a determination of an entity's status as an arm of the state"; rather, "[a] state's legal liability (or lack thereof) for an entity's debts merits far greater weight, and is therefore the key factor in our assessment of" the funding factor.[7] *Febres*, 445 F.3d at 236. MSU's indirect effects argument is therefore unavailing.

MSU does not argue that judgments against it would have a direct effect on the state treasury—and with good reason. We have identified only two exceptions to the rule that New Jersey law imposes no all-encompassing legal obligation on the part of the State to pay judgments entered against MSU. First, N.J. Stat. Ann. § 18A:3B-6(h) allows state colleges to elect to have the Attorney General represent them in suits brought under the New Jersey Tort Claims Act

---

[7] We have recognized two instances in which the "practical effect" of a judgment is tantamount to a legal obligation such that the entity may be entitled to Eleventh Amendment immunity. *Cooper*, 548 F.3d at 305 (discussing, but not applying, such scenarios); *Febres*, 445 F.3d at 235 n.9 (citing *Hess*, 513 U.S. at 50) (same). Both exceptions involve instances where Congress has put a proverbial "gun to the head" of the State to sustain the entity even without a *legal* obligation. *See Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 5 F.3d 378 (9th Cir. 1993); *Morris v. Wash. Metro Area Transit Auth.*, 781 F.2d 218 (D.C. Cir. 1986). Neither pertains to MSU.

16

(the "Tort Claims Act"), *id.* §§ 59:1-1 to :12-3, in which case the State is obligated to indemnify a college (or its employees) for any resulting judgment. *See also id.* §§ 59:10-1 to -10.[8] Second, the New Jersey Contractual Liability Act (the "Contractual Liability Act"), *id.* §§ 59:13-1 to -10, expressly waives the State's sovereign immunity for breach of contract claims arising from contracts entered into by "State" entities, *id.* §§ 59:13-2, -3.

Even assuming that New Jersey would have the legal obligation to pay judgments against MSU under the Tort Claims Act and the Contractual Liability Act, however, the exceptions embodied in those statutes only prove the rule, confirming the absence of an overarching legal obligation on the part of the State. Absent such obligation, this subfactor counsels against treating MSU as an arm of the State. *Bowers*, 475 F.3d at 546-47; *Febres*, 455 F.3d at 236.

### ii. Alternative Sources of Funding

The second subfactor under the funding inquiry— "whether the agency has the money to satisfy the judgment

---

[8] Conversely, if a college opts not to use the Attorney General to represent and indemnify it in tort actions, the college may retain counsel of its choosing and has the legal obligation to pay money judgments entered against it, N.J. Stat. Ann. § 18A:3B-6(h), counseling against immunity under the funding factor. A college's ability to decide whether to impose a legal obligation on the State for tort claims obviously also bears on the other two *Fitchik* factors: status under state law and autonomy. *See infra* Parts II.B.2 & II.B.3.

[itself]," *Fitchik*, 873 F.2d at 659, 662[9]—is more straightforward: we look to see if the entity has sources of funding aside from state appropriations and whether those funds could cover an adverse judgment. This necessarily involves a review of the percentage of funds a given entity receives from the State, but there is no hard-and-fast rule about how much funding from the State is enough to trigger immunity, and, in the wake of the Supreme Court's decision in *Doe,* the question of *legal liability* (*i.e.*, subfactor one, *see supra* Part II.B.1.i) remains paramount. *See Cooper*, 548 F.3d at 303; *accord Fitchik*, 873 F.2d at 660 ("[T]he fact that an entity derives some of its income from the state does not mean that it is entitled to partake of the state's immunity. . . . What is significant is whether the money that pays the fine will come from the state treasury rather than the agency's funds . . . ."). Beyond budgetary percentages, we also consider under this subfactor the extent to which the State retains ownership over the funds it appropriates and whether the entity is insured against money judgments. *Fitchik*, 873 F.2d at 660-62.

When reviewing the percentage of an entity's funds that come from non-state sources, we have regularly determined that alternative sources of funding—even where only a small part of the entity's overall budget—counsel against immunity. For example, we have concluded that an entity has the capacity to pay money judgments out of its own funds even where the State appropriates 85-90% of the entity's operating budget. *Febres*, 445 F.3d at 232-34 (noting

---

[9] "[A]gency" here—and elsewhere in our case law—is used to describe an entity that has argued it is owed Eleventh Amendment immunity.

18

that even where the State was the "principal source" of the entity's revenue, legal liability is the most important consideration post-*Doe*); *accord Cooper*, 548 F.3d at 303-06 (35-52% of the entity's funds coming from the State); *Bowers*, 475 F.3d at 547 (21% of funds from the State); *Bolden*, 953 F.2d at 818-19 (27% of funds from the State); *Fitchik*, 873 F.2d at 660-62 (less than 33% of funds from the State); *Kovats*, 822 F.2d at 1308-09 (50-70% of funds in the general operating account from the State). In many of these cases, we noted that the entity in question had the power to raise revenue itself, such as via fare increases for public transportation entities, or to dip into investments it had made in order to pay money judgments. *See Cooper*, 548 F.3d at 303-06; *Christy v. Pa. Tpk. Comm'n*, 54 F.3d 1140, 1146 & n.7 (3d Cir. 1995); *Bolden*, 953 F.2d at 818-19; *Fitchik*, 873 F.2d at 661.

MSU directs us to its own 2013 and 2014 financial statements to show that it is "fiscally dependent" on the State, Appellant's Br. 26-28. These reports indicate that, in the years 2012-2014, only 18.8-21.8% of MSU's annual revenues came from state appropriations.[10] Meanwhile, MSU derives

_____

[10] *See* O'Connor Davies, LLP, *Montclair State University (A Component Unit of the State of New Jersey): Basic Financial Statements and Management's Discussion and Analysis, June 30, 2014 and 2013* ("2013-2014 MSU Financial Statements") 9-10 (2014), *available at* http://www.montclair.edu/media/montclairedu/financetreasur er/controller/2014-MSU-Audit.pdf (last visited June 13, 2016); O'Connor Davies, LLP, *Montclair State University (A Component Unit of The State of New Jersey): Basic Financial Statements and Management's Discussion and Analysis and*

19

49.2-50.8% percent of its revenues from sources over which it has considerable control: *e.g.*, tuition, fees, and room and board,[11] *see* N.J. Stat. Ann. §§ 18A:64-6(n), (o), -13, -18, and is permitted to invest funds and retain the earnings on such investments, creating another source of funding separate from the state coffers, *id.* § 18A:64-18.2.

In addition to the mere existence of alternative sources of funding, we consider the degree to which funds appropriated by the State are owned by the State after being deposited into the entity's bank account.[12] *Fitchik*, 873 F.2d

_____

*Schedules of Expenditures of Federal and State of New Jersey Awards, June 30, 2013 and 2012* ("2012-2013 MSU Financial Statements") 8-9, *available at* http://www.montclair.edu/media/montclairedu/financetreasur er/controller/FY13-A-133-(Awards).pdf (last visited June 13, 2016). Although these documents were not part of the record before the District Court, we may take judicial notice of them because they are "public documents," N.J. Stat. Ann. § 18A:3B-6(l); *see also id.* § 18A:3B-51, and because Maliandi does not object to their consideration. *See Oran v. Stafford*, 226 F.3d 275, 289 (3d Cir. 2000) (citing to Federal Rule of Evidence 201(b)(2) and allowing, where the appellee does not object, an appellate court to take notice of the appellant's properly authenticated public documents that were required by law to be filed).

[11] 2013-2014 MSU Financial Statements 8-10; 2012-2013 MSU Financial Statements 8-9.

[12] While *Fitchik* considered the State's retention of ownership over appropriate funds in the second subfactor

20

at 661-62 ("[C]ontrol is . . . significant to the funding factor if it indicates ownership."); *see also Christy*, 54 F.3d at 1145-46 (noting that a State lacks financial interest in the diminution of funds it no longer controls). Indeed, "[t]he magnitude of the state's contribution" is of little relevance if "once deposited . . . the[] funds belong to the [entity]" because if state-appropriated funds are "used to pay a judgment, we can say only that the judgment was satisfied with the [entity's] monies." *Febres*, 445 F.3d at 234; *see also Kovats*, 822 F.2d at 1308-09 (noting that state contributions to Rutgers's budget were comingled with the University's tuition and other revenues into a discretionary pot of money over which Rutgers retained sole control).

Here, although MSU must abide by the "minimal" constraint that it spend its funds within the general parameters of the State's overall budget appropriations, *Kovats*, 822 F.2d at 1311 (discussing Rutgers's ability to spend freely in the context of autonomy), it otherwise may spend state-appropriated funds as it sees fit, N.J. Stat. Ann. § 18A:64-6(e), (f). Further, leftover state funds are retained by MSU rather than returned to New Jersey's treasury. *Id.* § 18A:64-18.1(b). Thus, it cannot be said that the State retains ownership over the funds once they have been allocated to MSU.

---

under the funding inquiry, 873 F.2d at 660-62, as we do here, later cases have considered it under the first subfactor, legal liability, discussed in Part II.B.1.i, *Christy*, 54 F.3d at 1146. Regardless, ownership is relevant to the funding factor and, in addition, it bears on the third *Fitchik* factor: autonomy. *See infra* Part II.B.3.

Another point we routinely consider in connection with alternative funding is whether a state-affiliated agency has the authority to purchase liability insurance to prevent shortfalls that could arise in the wake of large money judgments, so that the State is inoculated from any effect on its treasury. *Bolden*, 952 F.2d at 819; *Fitchik*, 873 F.2d at 661. That sheds little light here, however, as New Jersey authorizes state colleges to obtain liability insurance for tort, contract, and workers' compensation claims brought against them, N.J. Stat. Ann. § 18A:64-87, but does not authorize insurance across the board, *cf. id.* § 27:25-5(r) (authorizing the New Jersey Transit Corporation at issue in *Fitchik* to obtain "any type of insurance and indemnify against loss or damage to property from any cause").

On balance, MSU's alternative sources of funding also tip against immunity.

### iii. Statutory Immunity from Liability

The third subfactor stands for the simple proposition that where the State has expressly immunized itself from the entity's liabilities, it thereby indicates the entity is not an arm of the State and hence not entitled to protection under the Eleventh Amendment.[13] Here, New Jersey has immunized itself from the liability of its state colleges in two

---

[13] We have been far from vigilant about separating this subfactor from the first, with some of our cases combining the consideration of statutory immunity with the legal liability inquiry discussed in Part II.B.1.i. *E.g.*, *Cooper*, 548 F.3d at 304. Here, we consider it separately in line with *Fitchik*'s recitation of the three subfactors. 873 F.2d at 659.

circumstances: (1) for loans taken out by a state college upon which the college later defaults, N.J. Stat. Ann. § 18A:64-6(t), *i.e.*, an exception to the State's assumption of liability for contractual debts under the Contractual Liability Act; and (2) for a state college's violation of the requirements of the State College Contracts Law,[14] *id.* § 18A:64-6(k), an immunity of little significance to our analysis given that this law also immunizes the state colleges themselves, *id.* § 18A:64-81. Those isolated instances stand in stark contrast to the sweeping statutory immunity "from liability on judgments entered against Rutgers" that we said counseled against Eleventh Amendment immunity in *Kovats*. 822 F.2d at 1310-11 (citing N.J. Stat. Ann. § 18A:65-8); *accord Cooper*, 548 F.3d at 304; *Bolden*, 953 F.2d at 819; *Fitchik*, 873 F.2d at 661.[15]

---

[14] The State College Contracts Law imposes requirements and limitations on state colleges' contractual authority, such as mandating that a college engage in competitive bidding for projects exceeding $26,200. *See, e.g.*, N.J. Stat. Ann. § 18A:64-55.

[15] We reject the argument that the State's statutory immunity from liability in these two areas gives rise to a negative inference that the State is liable for judgments against MSU in all others. Particularly in the absence of any affirmative indication that the State has general responsibility for judgments against MSU, *e.g.*, N.J. Stat. Ann. § 18A:3B-6(h), we will not infer from two narrow statutory provisions—one of which is an exception to an express waiver of the State's immunity and the other of which simply makes clear that the statute does *not* serve as a waiver of

23

\* \* \*

In sum, while the third subfactor tends to favor treating MSU as an arm of the State, the other funding subfactors tip decisively the other way. We therefore conclude that the funding factor counsels against Eleventh Amendment immunity.

### 2. The Status Under State Law Factor

The second *Fitchik* factor requires us to ascertain the "status of the agency under state law," which includes such considerations as "how state law treats the agency generally, whether the entity is separately incorporated, whether the agency can sue or be sued in its own right, and whether it is immune from state taxation." *Fitchik*, 873 F.2d at 659. In addition to these subfactors explicitly listed in *Fitchik*, we have also considered the entity's authority to exercise the power of eminent domain, application of state administrative procedure and civil service laws to the entity, the entity's ability to enter contracts and make purchases on its own behalf, and whether the entity owns its own real estate. *See, e.g.*, *Bowers*, 475 F.3d at 548; *Bolden*, 953 F.2d at 820; *Fitchik*, 873 F.2d at 662-63; *Kovats*, 822 F.2d at 1310.

---

immunity—a *sub silentio* authorization of a raid on the state treasury. *Springer v. Gov't of Philippine Islands*, 277 U.S. 189, 206 (1928) (explaining that courts do not draw negative inferences when "a contrary intention on the part of the lawmaker is apparent"); *Reilly v. Ozzard*, 166 A.2d 360, 365 (N.J. 1960) (rejecting negative inferences when context indicates such inferences are improper).

We have recognized that the multifaceted nature of the status under state law factor can make it so hopelessly "checkered" that it does not "significantly help in determining whether [the entity] is entitled to immunity from suit in federal court," and thus effectively drops out of our overall *Fitchik* analysis. *Fitchik*, 873 F.2d at 662 (citing *Kovats*, 822 F.2d at 1310). That is not the case here, however. We address each consideration below and conclude that, while MSU certainly has attributes that point both ways, on the whole its status under state law counsels in favor of extending Eleventh Amendment immunity.

Treatment Under State Law Generally. In determining "how state law treats the agency generally," *id.* at 659, we look to (1) explicit statutory indications about how an entity should be regarded; (2) case law from the state courts—especially the state supreme court—regarding an entity's immunity or status as an arm of the State; and (3) whether the entity is subject to laws for which the State itself has waived its own immunity (such as state tort claims acts). *E.g.*, *Christy*, 54 F.3d at 1148-49; *Fitchik*, 873 F.2d at 662-63; *Skehan I*, 538 F.2d at 62. Those indicators point both ways here, leading us to conclude that MSU's general treatment under state law is simply inconclusive.

As for explicit statutory indicators, MSU argues that New Jersey law squarely locates state colleges in the Department of State, thus indicating they exist as agencies—and therefore "arms"—of the State. But the statute MSU cites is a double-edged sword. True, N.J. Stat. Ann. § 18A:3B-27 provides that "any State institution of higher education . . . shall be allocated to the Department of State," but the statute continues: "[n]otwithstanding this allocation, any such institution shall be independent of any supervision

25

or control of the Department of State or any board, commission or officer thereof and the allocation shall not in any way affect the . . . institutional autonomy" of the college.[16] MSU's statutory "allocation" to the State thus offers little guidance.[17]

---

[16] In a related argument directed at *Fitchik*'s third factor, autonomy, MSU urges that New Jersey's abolishment in 2011 of the Commission on Higher Education—an entity that was designed to be a liaison between the colleges and the Governor's office and to engage in some administrative oversight of the colleges, N.J. Stat. Ann. § 18A:3B-13—and its transfer of those duties to the Secretary of Higher Education, 43 N.J. Reg. § 1625(a), reflects a deliberate consolidation of power in a cabinet-level official that strips the colleges of autonomy. As observed by the District Court, however, MSU's characterization of this change is misplaced, for the implementing regulation expressly states that it was designed not only to "improve the effectiveness of the State's oversight of higher education" but also to "improv[e] the strength and independence of boards of trustees," *id.*; thus it does not represent some sea change in the institutions' autonomy under state law.

[17] State colleges also are described with reference to the "State" or as "state agenc[ies]" in other statutory provisions. *E.g.*, N.J. Stat. Ann. §§ 18A:3B-6(h) (referring to state colleges as "State entities"), 52:14B-2 (referring to entities subject to the New Jersey Administrative Procedure Act as "state agenc[ies]"), 59:1-3 (referring to certain entities subject to the Tort Claims Act as part of the "State"), 59:13-2 (same for the Contractual Liability Act). We attach only

26

MSU's treatment under New Jersey case law is likewise inconclusive. In *Fuchilla v. Layman*, 537 A.2d 652, 655-67 (N.J.), *cert. denied*, 488 U.S. 826 (1988), the New Jersey Supreme Court invoked *Urbano* to determine that the University of Medicine and Dentistry of New Jersey would not qualify as an alter ego of the State for purposes of Eleventh Amendment immunity and hence qualified as a "person" subject to liability for discrimination claims brought under 42 U.S.C. § 1983 and the NJLAD. Just three years later, however, the same Court explained that New Jersey City University (then known as Jersey City State College)— a college very similar to MSU—is a "State agency" for some purposes, suggesting that it would be immune from local regulations and property taxes, even though it might not be for discrimination claims. *N.J. Educ. Facilities Auth. v. Gruzen P'ship*, 592 A.2d 559, 563 (N.J. 1991).[18] Thus, the

---

limited significance to a State's denomination of an entity as an arm of the State, however, for blind deference to a legislature's description would abdicate the courts' responsibility to conduct individualized determinations and would bestow upon States the unfettered ability to immunize the activities of any number of entities. *See Christy*, 52 F.3d at 1149 n.9 (citing *Bolden*, 953 F.2d at 815 n.8, 817).

[18] We disagree with MSU that *Fuchilla* is not relevant to MSU because the college at issue in that case was then governed by a different set of statutes than those governing state colleges like MSU. While that is true as far as it goes, *New Jersey Educational Facilities Authority* then cited to *Fuchilla* to suggest that New Jersey City University—a state college that *is* governed by the same statutes as MSU—might not be immune from discrimination claims. 592 A.2d at 563.

New Jersey Supreme Court—purporting to adhere to our *Urbano/Fitchik* framework—appears to have adopted a claim-specific approach to immunity that turns on "the fundamental purposes of the relevant laws or doctrines and the reasons [the court] believe[s] would best accord with the measure of independence the Legislature would intend to give to the State-university system." *Id.*

In *Fitchik*, we cited *Fuchilla* favorably and characterized it as "evinc[ing] some reluctance on the part of the New Jersey courts to accord immunity to agencies whose status under New Jersey statutes is ambiguous." 873 F.2d at 663. Given the New Jersey Supreme Court's subsequent decision in *New Jersey Educational Facilities Authority*, however, its jurisprudence is of limited use to our analysis because, to the extent it assumed our *Urbano/Fitchik* test would authorize courts to parse *claim*-specific Eleventh Amendment immunity, it was mistaken. We view that approach as untenable—both practically and in principle. *Fitchik* contemplated judicial determinations of Eleventh Amendment status for entities, not for claims, and carving discrimination claims out for special treatment does not square with that categorical model.[19] Moreover, because

---

[19] Of course, Congress may abrogate Eleventh Amendment immunity for specific claims pursuant to its authority under the Fourteenth Amendment, and States may waive their immunity to suit in federal court at their discretion if done unequivocally. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 99 (1984); *see also Pa. Fed'n of Sportsmen's Clubs v. Hess*, 297 F.3d 310, 323 (3d Cir. 2002).

*Fuchilla* was decided before *Fitchik* condensed *Urbano* into three factors and before *Benn* rendered the funding factor co-equal, the propriety of *Fuchilla*'s Eleventh Amendment analysis is suspect in light of those changes to our jurisprudence. *See, e.g.*, *Endl v. New Jersey*, 5 F. Supp. 3d 689, 699-700 (D.N.J. 2014) (questioning the continued vitality of *Fuchilla* in a post-*Fitchik* world); *Overton v. Shrager*, C.A. No. 09-6299 (MLC), 2011 WL 2937363, at *4-5 (D.N.J. 2011) (same).[20]

---

[20] MSU directs us to two additional state cases that do specifically address MSU, but neither purports to apply *Fitchik*, and both give only mixed signals. In *Chasin v. Montclair State University*, the New Jersey Supreme Court implicitly recognized that MSU professors are state employees for purposes of the Tort Claims Act, thus entitling them to representation and indemnification by the State to the extent allowed by the Tort Claims Act, but that case also recognized that state colleges and their faculty retain significant autonomy regarding the defense of tort claims not afforded to other state entities and employees. *See* 732 A.2d 457, 469 (N.J. 1999); *but cf. N.J. Educ. Facilities Auth.*, 592 A.2d at 563 (noting that state university employees may not be considered state employees in conflict-of-interest cases). And in *Batkay v. Montclair State University*, New Jersey's intermediate appellate court called MSU "a state agency," but it simultaneously recognized that, while MSU may be housed in the Department of State, it is deemed by statute to be autonomous. *See* Dkt. No. A-3806-02T2, slip op. at 4-6 (N.J. Super. Ct. App. Div. Jan. 27, 2004) (per curiam) (citing N.J. Stat. Ann. § 18A:3B-27).

The third indicator of treatment under state law—whether the entity is subject to laws for which the State has waived its own immunity—also does little to tip the scales here. On the one hand, MSU is subject to the Tort Claims Act, which typically counsels in favor of immunity because it implies that, like the State itself, MSU would be immune from tort claims absent the Act. On the other hand, this Tort Claims Act—in contrast to the one we observed favored immunity for the University of Iowa in *Bowers*, 475 F.3d at 548 (citing Iowa Code ch. 699, 670)—also applies to municipalities and counties, which do not benefit from Eleventh Amendment immunity, *Lake Country Estates, Inc. v. Tahoe Reg'l Planning Agency*, 440 U.S. 391, 401 (1979), thus undercutting the inference that entities subject to this Act are otherwise immune from suit, *Fitchik*, 873 F.2d at 663 (discounting the pertinence to the immunity inquiry of New Jersey's Tort Claims Act because it applies to political subdivisions as well).

Separate Incorporation. Separate incorporation disassociates an entity from its State and thus weakens its claim to Eleventh Amendment immunity. *See Fitchik*, 873 F.2d at 663. This consideration has little bearing on MSU, however, for while New Jersey law provides that state colleges "have the power and duty to . . . [a]dopt and use a corporate seal," N.J. Stat. Ann. § 18A:64-6(a), there is no indication that MSU has ever invoked this authority to actually incorporate. *Cf. id.* § 18A:65-2 and -11 (expressly preserving Rutgers's corporate seal and independent corporate status from its time as a private institution).

Ability to Sue and Be Sued. An entity is more likely to be an arm of the State and partake of Eleventh Amendment immunity if it lacks the ability to sue and be sued in its own

30

name. *See Fitchik*, 873 F.2d at 663. State colleges like MSU enjoy no explicit grant of such authority, and state case law indicates that, in the absence of an affirmative grant of such power, a state college cannot sue and be sued in its own right. *Frank Briscoe Co. v. Rutgers, the State University*, 327 A.2d 687, 693 (N.J. Super. Ct. Law Div. 1974).[21]

Not only does the absence of an affirmative grant of the power to sue and be sued indicate MSU lacks such authority, but provisions of the New Jersey code that govern MSU support that conclusion as well. For example, the Tort Claims Act and the Contractual Liability Act, which do not apply to entities that can sue and be sued, N.J. Stat. Ann. §§ 59:1-3, :13-2, do apply to state colleges like MSU, *see id.* § 18A:3B-6(h) (authorizing state colleges to use the Attorney General to represent them in Tort Claims Act suits); *id.* § 59:13-2 (providing that entities that can sue and be sued are not subject to the Contractual Liability Act); *Stony Brook Constr. Co. v. Coll. of N.J.*, 2008 N.J. Super. Unpub. LEXIS 799, at *38-39 (N.J. Super. Ct. App. Div. June 16, 2008) (unpublished) (concluding that because a state college governed by the same statutes as MSU cannot sue and be sued, it is subject to the Contractual Liability Act).

---

[21] The New Jersey Superior Court deemed Rutgers an exception to this rule because it had the power to sue and be sued in its capacity as a private institution and, in the absence of contrary legislative intent, thereby retained that power when it became a public university, notwithstanding the absence of any affirmative grant of such authority by the legislature. *Frank Briscoe Co.*, 327 A.2d at 693.

In addition, although state colleges like MSU were authorized by statute to make a binding election within a certain window of time to retain private counsel (instead of being represented by the Attorney General) to defend against tort claims, which might indicate an ability to sue and be sued generally, the same statute specifies that opting for private representation renders the college "a sue and be sued entity for the purposes of the 'New Jersey Tort claims Act' only." N.J. Stat. Ann. § 18A:3B-6(h). The statute also provides that, should a college opt for private representation, it must provide its employees with the "defense and indemnification" that they, as state employees, would "otherwise . . . be entitled to from the Attorney General pursuant to [the Tort Claims Act]." *Id.* These provisions make clear that, in the normal course, colleges like MSU are treated for litigation purposes like any state agency and thus may not sue and be sued under New Jersey law.

Indeed, the only indication that MSU can sue and be sued in its own name is that it hired a private law firm to bring a civil suit in 2012. *See Montclair State Univ. v. Oracle USA, Inc.*, C.A. No. 11-2867 (FLW), 2012 WL 3647427 (D.N.J. Aug. 23, 2012). In supplemental briefing, MSU argued that this suit was not evidence of any general statutory authorization to sue and be sued because MSU was specifically permitted to bring that suit under N.J. Stat. Ann. §§ 18A:3B-6(h) and 18A:64-7. But neither statute supports that assertion. While § 18A:3B-6(h) authorizes state colleges "[t]o retain counsel of the institution's choosing," for the reasons explained above, the same provision indicates that state colleges are authorized to sue and be sued only in the limited context of Tort Claims Act claims. Setting aside the myriad reasons a college may have to retain counsel other

32

than to pursue litigation, the lawsuit in *Oracle* proceeded on contractual claims—after all tortious claims had been dismissed—in apparent defiance of the limited, torts-only scope of sue and be sued authority afforded to state colleges by statute. 2012 WL 3647427, at *12. And § 18A:64-7 authorizes colleges to "exercise the powers, rights and privileges that are incident to the proper government, conduct and management of the college . . .," but it does not reference litigation at all. That this appears to be the sole instance in which MSU has brought suit in its own name, and given its lack of authority to sue and be sued outside the Tort Claims Act context, we suspect MSU acted outside of its authority when it filed suit in *Oracle*, and we will not abrogate Eleventh Amendment immunity on the basis of an apparent aberration. In sum, MSU's inability to sue and be sued favors immunity.

Immunity from State Taxes. It is undisputed that MSU and other state colleges are immune from state taxes and from municipal and county ordinances. *O'Connell v. State*, 795 A.2d 857, 863 (N.J. 2002) ("Montclair [State University] is exempt from federal and state taxation."); *see also N.J. Educ. Facilities Auth.*, 592 A.2d at 563 (indicating that New Jersey City University, which is governed by the same statutory scheme as MSU, would be immune from local land-use regulations). This fact clearly weighs in favor of immunity. *See Fitchik*, 873 F.2d at 663.

Eminent Domain. State colleges have the power of eminent domain. N.J. Stat. Ann. § 18A:64-6(l). Because this is a sovereign power, it tips slightly in favor of immunity, but, just as with the Tort Claims Act, we take this fact with a grain of salt because New Jersey's political subdivisions also have this authority. *Fitchik*, 873 F.2d at 663.

33

Administrative Procedure and Civil Service Laws. An entity's claim to immunity is stronger if it is subject to a State's administrative procedure and civil service laws. *Kovats*, 822 F.2d at 1310 (noting that Rutgers's claim to immunity was weakened by the fact that, "unlike other state agencies, [Rutgers is] not subject to civil service laws . . . or administrative procedure requirements"). State colleges like MSU are subject to the strictures of the New Jersey Administrative Procedure Act, N.J. Stat. Ann. §§ 52:14B-1 to -31, when carrying out certain disciplinary or employment proceedings, and the decisions rendered by the colleges in those instances are subject to judicial review. *Id.* § 18A:3B-6(f). Moreover, for a significant subset of employees, state colleges are subject to New Jersey's civil service laws, *id.* § 18:64-6(i)—a fact that, according to MSU, is unique among the States. MSU also notes that it should be viewed more like a state agency because its employees benefit from the state health care and pension programs, N.J. Stat. Ann. § 18A:66-170, and we agree this trait is relevant. These attributes counsel in favor of immunity.

Power to Enter Contracts. We also consider whether an entity may enter contracts on its own accord, which cuts against immunity, *see Kovats*, 822 F.2d at 1310 (noting that Rutgers is not subject to New Jersey's competitive bidding statutes), and whether its contractual authority is subject to state-imposed limits, which cuts in favor, *see Bowers*, 475 F.3d at 548 (noting that the University of Iowa "is unable to buy or transfer real estate without the express permission of" another state agency). Unhelpfully, for New Jersey state colleges, the answer is "yes" to both questions, *see* N.J. Stat. Ann. § 18A:64-6(k) (authorizing state colleges to enter contracts subject to the provisions of the State College

Contracts Law, N.J. Stat. Ann. §§ 18A:65-52 to -93), rendering this consideration of little relevance.

Ownership of Land.  Finally, we take note of whether a state-affiliated institution of higher learning retains title of the land on which it sits, with state ownership tipping in favor of immunity.  *Bowers*, 475 F.3d at 548 (noting that, per the state constitution, Iowa owned the University of Iowa's land); *Kovats*, 822 F.2d at 1309 (noting that Rutgers retained title to the land on which it sits).  Here this consideration slightly disfavors arm of the State status, as MSU appears to retain title to at least some of its land.  New Jersey state colleges are authorized to purchase and own property without seeking state permission, implying that, in such instances, the property is titled under the college's name.  N.J. Stat. Ann. § 18A:64-6(k), (q).  And although state law provides that parcels "titled in the name of the State Board of Higher Education or the State Department of Higher Education, which are occupied by a public institution of higher education[,] shall be titled in the name of the State of New Jersey," *id.* § 18A:72A-29, it also describes certain land as being "owned by [a] university or by [a] particular college," *id.* § 18A:72A-26, and contemplates land conveyances "executed and delivered in the name of the college," *id.* § 18A:72A-29.

\* \* \*

We emerge from this analysis with subfactors on both sides of the scale as to MSU's "status under state law."  One of them—ownership of land—points against immunity, and three others—treatment under state law generally, separate incorporation, and power to enter contracts—are inconclusive.  But considering that MSU cannot sue and be

35

sued in its own name, is immune from state taxes, can exercise the power of eminent domain, and generally is subject to New Jersey administrative procedure and civil service laws, the balance of considerations defining MSU's "status under state law" cuts in favor of immunity. The second *Fitchik* factor thus tips in MSU's favor.

### 3. The Autonomy Factor

Although an entity's treatment under state law has obvious repercussions for the autonomy of its operations, *Fitchik* directs that autonomy be analyzed as a distinct factor, focusing on the entity's governing structure and the oversight and control exerted by a State's governor and legislature. *See, e.g.*, *Febres*, 445 F.3d at 231-32; *Fitchik*, 873 F.2d at 663-64. The lesser the autonomy of the entity and greater the control by the State, the greater the likelihood the entity will share in the State's Eleventh Amendment immunity. While the New Jersey code again gives some inconsistent signals, we conclude it imposes sufficient constraints on MSU's autonomy to favor immunity.

Our benchmarks, at the opposite ends of the spectrum, are Rutgers and the University of Iowa. In *Kovats*, we concluded Rutgers was "largely autonomous." 822 F.2d at 1311. It had two governing boards: the eleven-member Board of Governors, of which six were appointed by the Governor of New Jersey, and the Board of Trustees, a minority of which were appointed by the Governor. *Id.* Because of the institution's history as a private institution, the trustees held significant power, further insulating decisionmaking from the Governor's control. *Id.* By statute, both boards were "given a high degree of self-government" and were empowered to act "without recourse or reference to

36

any department or agency of the state, except as otherwise expressly provided." *Id.* (quoting N.J. Stat. Ann. §§ 18A:65-27(I)(a), -28). The boards were encumbered by only two state-imposed limitations, the effect of which we deemed "minimal": the Board of Governors had to comply with the State's budget appropriations and abide by state laws and regulations. *Id.* Moreover, Rutgers was not required to manage its funds as public monies, could establish accounts and invest or withdraw funds as desired, could make unregulated spending decisions within the broad contours of the State's appropriations, only had to report its financial choices to the State (rather than obtain approval from the State), and did not have to comply with civil service, competitive bidding, or administrative procedure requirements. *Id.* at 1311-12. In short, the Governor and state legislature had little power over the inner workings of Rutgers aside from a small number of appointments and overall spending parameters for state funds.

Contrast the University of Iowa, where we concluded the entity was not autonomous. The Board of Trustees, we determined, was "tightly constrained by state authority" because all nine members of the Board were appointed by the Governor for six-year terms and were removable by the Governor for cause (with state senate approval); the Board's expenses were reimbursed by the State and reported to the Governor; various state statutes constrained the Board's procurement capabilities, ability to accept and administer trusts, and the number and location of meetings allowed; the Board could not acquire or transfer real estate without permission from a council that included the Governor and members of his cabinet; the Board had to turn over ownership of all patents and copyrights to the State; the Board was

37

required to file biennial budget reports to the Governor and legislature; and the Board had to hire a budget analyst to prepare its budget. *Bowers*, 475 F.3d at 548-49.

While MSU shares characteristics of both of these schools, it is, on the whole, more akin to the University of Iowa, and hence, we conclude, not autonomous. The Governor looms large in the affairs of New Jersey state colleges. All members of the Board of Trustees are appointed by the Governor and confirmed by the state senate for six-year terms, from which they are removable for cause. N.J. Stat. Ann. § 18A:64-3. In addition, the Governor is statutorily designated as the public "employer" of all college employees, which vests him with the sole power to collectively bargain on their behalf. *Id.* § 18A:64-21.1.

Although the Governor possesses no apparent veto authority over state college decisions,[22] the Secretary of Higher Education, a member of the Governor's cabinet, has authority to issue master plans for higher education in the

_____

[22] We did not consider the relevance of a gubernatorial veto in *Kovats* or *Bowers*, but we did in *Fitchik*, where we determined the entity's board was "significantly autonomous," but the Governor could subsequently veto the board's actions. 873 F.2d at 663-64; *see also Febres*, 445 F.3d at 230-31 (considering the effect of the Governor's "constrained" veto power on autonomy). Our conclusion in *Fitchik* that the particular combination of significant autonomy and gubernatorial control counseled "slightly" in favor of immunity, 873 F.2d at 664, has little bearing here where MSU's board cannot be described as "significantly autonomous."

38

State, license and accredit the institutions, impose ethics rules for them, approve certain new academic programs, review budget requests, and issue regulations relating to licensure, outside employment, tuition, personnel, tenure, and retirement programs. *Id.* §§ 18A:3B-14, -15; *see also* 43 N.J. Reg. § 1625(a). The Secretary may also, "with the concurrence of the Governor," visit a school at any time to review its financials and compliance with all appropriate laws and regulations and may issue subpoenas to investigate suspected wrongdoing. N.J. Stat. Ann. § 18A:3B-34. The colleges also are required to spend their budgets in accordance with the general provisions of the state budget and appropriations, and may be subject to audit at any time to ensure such conformance. *Id.* § 18A:64-6(f).

New Jersey law further constrains state colleges like MSU by subjecting them to the Administrative Procedure Act, the State College Contracts Law, and the civil service laws.[23] *Id.* §§ 18A:3B-6(f), :64-6(h), (k), (w), (x), :64-52 to -93. In addition, they must comply with certain limitations on their ability to make deposits in financial institutions absent security from the institution, *id.* § 18A:64-18.5; restrict their government relations and lobbying activities according to statutory bounds, *id.* § 18A:3B-54; and have their contractual obligations tied to the state coffers under the Contractual

---

[23] Academic faculty are excepted from the civil service laws, giving colleges considerable autonomy to set salaries for those individuals and to hire or fire them without being subject to review by the Vacancy Review Board. N.J. Stat. Ann. §§ 18A:64-21.2, -21.3.

Liability Act, *id.* § 59:13-1 to -10; *Stony Brook Constr. Co.*, 2008 N.J. Super. Unpub. LEXIS, at *38-39 .

These colleges are also subject to significant reporting requirements and rules for internal governance. For example, they must hire an independent auditor and prepare a publicly available audit, prepare an annual report on their general operations, prepare a long-range facilities plan that includes a description of the source of non-state funds, and present the Governor and legislature with an annual budget report. N.J. Stat. Ann. §§ 18A:3B-6(l), -35, -39, -48 to -51, :64-6(d). Moreover, each college's board of trustees is required to hold a September meeting every year, and the presidents of each college (who are, themselves, selected by the gubernatorial-appointed board, *id.* § 18A:64-6(g)) are required by law to sit on the Presidents' Council. *Id.* §§ 18A:3B-7, :64-4.

At the same time, we recognize MSU bears some hallmarks of an autonomous entity. For example, the New Jersey legislature has on many occasions declared its intention for state colleges to have "institutional autonomy." *Id.* § 18A:3B-27.[24] While trustees are appointed by the

---

[24] *See also* N.J. Stat. Ann. § 18A:64-7 (characterizing the boards' powers as being "exercised without recourse or reference to any department or agency of the State"); *id.* § 18A:3B-2 (seeking "the elimination of unnecessary State oversight" and providing "greater decision making and accountability . . . at the institutional level"); *id.* § 18A:64-1 (offering state colleges "a high degree of self-government"). Although we view skeptically a state legislature's denomination of an entity as an arm of the State, we do so to prevent States from sweeping too many entities into the ambit of the Eleventh Amendment, *see supra* n.17; that concern is

Governor, they receive no compensation and can only be removed from their six-year terms for cause, according them considerable decisional independence once appointed. *Id.* § 18A:64-3, -5; *accord Univ. of R.I. v. A.W. Chesterton Co.*, 2 F.3d 1200, 1208 (1st Cir. 1993). *But cf. Bowers*, 475 F.3d at 549 (noting that the University of Iowa was not autonomous in part because the Governor could remove board members for cause). And the Board of Trustees does retain some degree of self-governance and significant authority to manage MSU.[25] But we are not persuaded that these attributes of

absent when a legislature indicates an entity is not an arm of the State by describing it as autonomous, and we thus may give more weight to such pronouncements. Here, however, in the broader context of the colleges' reporting obligations, government oversight, and statutory placement in the Department of State, we take these pronouncements to reflect the legislature's effort to navigate between granting colleges the autonomy necessary for academic independence and competitiveness on the one hand, and providing significant oversight over their internal governance on the other.

[25] For example, it retains power to choose its own size (between seven and fifteen members) and to set the number and dates of its meetings (aside from the required September meeting). N.J. Stat. Ann. § 18A:64-3, -4. In addition, it is authorized, among other things, to set, raise, and keep tuition and fees, *id.* §§ 18A:3B-6(c), :64-6(n), (o), -13, -18, to settle disputes (under the Administrative Procedure Act rules), *id.* § 18A:3B-6(f), to invest and reinvest funds (and save its earnings), *id.* §§ 18A:3B-6(g), :64-18.2, to purchase real estate and other property without preapproval (but subject to limits), *id.* § 18A:64-6(k), (q), to set its own educational

independence, when weighed against the indicia of state control, make MSU autonomous.

\* \* \*

In sum, notwithstanding that it retains some modicum of autonomy and that the indicia of state control are not as "tight[]" as in *Bowers*, 475 F.3d at 549, we conclude that MSU's autonomy is constrained enough to tip this factor in favor of immunity.

### 4. Balancing

The upshot of our review is that *Fitchik*'s funding factor weighs against immunity, but its status under state law and autonomy factors both favor immunity. Thus, on balance, the *Fitchik* factors favor MSU's claim to Eleventh Amendment protection. *See Bowers*, 475 F.3d at 549-50. We recognize that, absent recourse to the federal courts, Maliandi may have limited and unsatisfying avenues to obtain relief for the alleged discrimination she suffered. Yet, comity and state sovereignty are constitutional precepts and lynchpins of our federalist system of government, and where, as here, the State creates an entity that functions on balance as an arm of the State, the Eleventh Amendment's protection must carry the day. Accordingly, the constitutional right of the State of New Jersey to be free from private suit in federal court must be

curriculum and internal policies, *id.* § 18A:64-6(b), (c), to form, along with other state institutions, 501(c) organizations, *id.* § 18A:3B-6.1, to purchase some types of insurance, *id.* § 18A:64-87, and to control its own grounds, buildings, and other property, *id.* § 18A:64-19.

respected, and, unless the District Court determines on remand that New Jersey has waived its immunity for Maliandi's NJLAD claim, the suit against MSU must be dismissed.

## III.  Conclusion

For the foregoing reasons, we will reverse and remand the case for proceedings consistent with this opinion.